SANDERS *v.* BERRY.

Opinion delivered July 14, 1919.

1. FRAUD AND DECEIT—SALE OF LAND—COMMISSION OF AGENT.—L. owned a zinc mine, and B. negotiated a lease thereof to H. and G., the lease containing an option to purchase for $20,000, with a provision for the payment of a substantial commission to B. H. and G. assigned the lease to a corporation of which one A. was the principal stockholder. Thereafter L. sold the mine to S., a sister of A., for $8,000 cash. *Held,* the chancellor was warranted in finding that the sale to S. was colorable merely, and that the real sale was to her brother, A., the title being put in her name for the purpose of defrauding B. out of his commission in making the sale.

2. FRAUD AND DECEIT—ACTS AND DECLARATIONS OF CONSPIRATORS.— When the connection of individuals to accomplish a fraud is shown, every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is original evidence against each of them.

3. FRAUD AND DECEIT—DECLARATIONS OF ONE CONSPIRATOR MADE IN THE OTHER'S ABSENCE.—Where a conspiracy between three parties to defraud a fourth out of commissions due under a contract is established, evidence of the declarations of two of the conspirators made in the absence of the third, is admissible in a suit against them all.

Appeal from Marion Chancery Court; *Ben F. McMahan,* Chancellor; affirmed.

STATEMENT OF FACTS.

J. C. Berry brought this suit in equity against Mabel A. Sanders, Jas. C. Ley, J. M. Goldman, A. B. Hamilton, P. R. Papin, A. W. Sanders, F. J. Gilbrault, F. E. Newbery, W. S. Dennison and N. I. Reiter, to recover a commission alleged to be due him under a contract with Jas. C. Ley for the sale of certain mining lands and mining improvements in Marion County, Arkansas, by Ley to Mabel A. Sanders, and to have a lien declared on the lands to the extent of his commission.

A demurrer was sustained to the original complaint and the plaintiff filed an amended complaint. A demurrer was again interposed by Mabel A. Sanders to the amended complaint and the court dismissed the case as to all of the defendants except Jas. C. Ley and Mabel A. Sanders.

In July, 1915, Jas. C. Ley resided in Marion County, Arkansas, and owned 200 acres of land in said county and operated a zinc mine thereon. He owned valuable machinery and buildings, etc., used in connection with the operation of the mine which were affixed to the soil. On the 3d day of July, 1915, Ley, by a contract in writing, leased the lands and mine to A. B. Hamilton and J. M. Goldman. The lease contained an option clause under which the lessees had the right to purchase the land at any time within one year for the sum of $20,000, and it was agreed that should the sale be consummated under the option, all moneys payable on the royalties under the provisions of the lease and on the purchase price of the lands should be paid to the credit of Jas. C. Ley in the Bank of Yellville, Ark. It was further provided that the lease should remain in force for one year from the date thereof.

Jas. C. Berry was the agent of Ley in making the contract and procured Hamilton and Goldman to execute it. In order to pay him for his services, Ley executed in his favor the following instrument:

"Yellville, Ark., July 3, 1915.
"Bank of Yellville:

"You are hereby authorized, in case I, James C. Ley, effect a sale of the northeast quarter of the northeast quarter, section 6, township 19 north, range 17 west, the north half of the northwest quarter of section 5, township 19 and south half southwest quarter, section 32, township 20 north, range 17 west, under a lease and option this day executed to A. B. Hamilton and J. M. Goldman or their successor and assigns, to pay out of any money, paid into the bank on purchase of said lands, to J. C. Berry, the sum of $2,000 (two thousand dollars) as commission for services rendered in connection with the making of such sale.

"In event of failure of sale of the property, I agree to pay and authorize the bank to pay J. C. Berry one per cent. on all royalties paid on ores mined and sold from said property under such lease."

The lease and the contract to pay Berry, together with other papers pertaining to the transaction were put in a wrapper and placed in the Bank of Yellville. The following endorsement was written on the wrapper: "These title papers (deeds, patents and abstracts) are the property of James C. Ley of Dodd City, Arkansas, and by directions of both parties to a mining lease and option executed on the 3d day of July, 1915, by James C. Ley to J. M. Goldman and A. B. Hamilton are deposited in escrow in the Bank of Yellville to remain pending negotiations for purchase under said option; if lands are purchased under option, deeds and abstracts to be delivered to Goldman and Hamilton by their successors, otherwise to be returned to Ley, July 5, 1915."

The lease and option were duly assigned by A. B. Hamilton and J. M. Goldman to the St. Louis Zinc & Lead Company on the 2d day of August, 1915. This corporation was organized for that purpose and immediately went into possession of the property and spent about $5,000 in making additional improvements thereon. A. W. Sanders, a brother of the defendant, Mabel A. San-

ders, was the largest stockholder in the St. Louis Zinc & Lead Company.

J. C. Berry was the principal witness for himself. He testified substantially as follows: I am acquainted with only a part of the defendants, namely, Jas. C. Ley, A. B. Hamilton, J. M. Goldman, A. W. Sanders, N. I. Reiter and P. R. Papin. I do not know Mabel A. Sanders. I took A. B. Hamilton and J. M. Goldman to the Nakomis mine, the property in controversy, and together with Jas. C. Ley we went over all the property, examined the mill and all the machinery in the mill. We went to the shafts and different prospects that had been shown upon the property. We went to the store building and looked over the mine supplies. Hamilton and Goldman, after thoroughly examining the property, entered into the lease and option contract which is the basis of this lawsuit. Some time during the fall Ley came to me and wanted me to see some parties interested in the lease and see if we could not arrange a loan on the property. All of the parties interested except Ley and myself were nonresidents of the State. N. I. Reiter became the manager of the mine for the lessee. I told Ley I did not think the parties would lend him any money and he never had any conversation with me in regard to the sale until December 10, 1915, at which time N. I. Reiter, A. W. Sanders and J. C. Ley registered at my hotel and stopped there for a day or two. The next morning Ley said that Reiter and Sanders were down there to look over the papers in the bank and verify the papers in escrow there. He further stated to me that he was going to make a sale of the property and that I would get the amount of my commission as agreed upon. I told him that would be all right. Mr. Reiter and Mr. Sanders never said anything to me at that time as to what their business was in Yellville. I have never seen Mr. Ley since that day. During the latter part of December, 1915, Reiter brought a deed down from Ley to Mabel A. Sanders to the property in question and left it for record. I learned from Reiter then that Ley had conveyed the property to Mabel

A. Sanders by a quitclaim deed. Reiter also stated that he was the agent of Mabel A. Sanders and had negotiated the title for her and that A.. W. Sanders did not know anything about the deal. He also stated that I was taken care of in the deal and that my commissions would be paid. He told me that Mr. R. A. Grund of St. Louis was Mabel A. Sanders' attorney and that he had drawn up the papers for her. Reiter continued to manage the mine after Ley conveyed the property to Mabel A. Sanders, but thereafter he acted for her instead of for the lessee. The lessee abandoned its lease after the conveyance by Ley to Mabel A. Sanders.

P. T. Glass was cashier of the Bank of Yellville at the time the lease and other papers were put in the bank and the instructions to the bank were filed with the papers. He testified that on or about December 10, 1915, Mr. Ley, Mr. Reiter, and Mr. Sanders all three came to the bank for the purpose of examining these papers and spent the greater part of an afternoon and some of the following forenoon in making the examination; that he was in St. Louis from the 11th to the 17th day of December, 1915, and in two or three days after he got there J. M. Goldman came to the hotel where he was stopping and told him to tell J. C. Berry that there was a scheme to beat him out of his commission on the sale of the Nakomis mine; that he told Berry about this.

W. E. Layton was the president of the Bank of Yellville and a brother-in-law of J. C. Berry. According to his testimony, Mr. Ley, Mr. Reiter and Mr. A. W. Sanders called at the bank for the purpose of examining the papers relating to the lease and option for the sale of the mine and the papers were turned over to them for their inspection. They came back the second time and examined the papers. Mr. Ley told me in the presence of Mr. Reiter and Mr. Sanders that Mr. Berry would be cared for according to the contract they had made with him. They said they were here for the purpose of closing a deal for the sale of the property. Mr. Ley went far enough to say that unless Mr. Berry was taken care of in the matter he would not sell it.

Mabel A. Sanders was a witness for herself. Her deposition was taken on interrogatories and cross-interrogatories at Los Angeles, California, where she resides. Her testimony is substantially as follows: I am a sister of A. W. Sanders, and my residence is Los Angeles, California. I was in the city of St. Louis, Missouri, in December, 1915, visiting my brother, A. W. Sanders. During the first part of December, 1915, J. C. Ley came to my brother's house in St. Louis and my brother introduced him to me. Ley wanted to borrow some money on a zinc and lead mine which he owned in Arkansas, but my brother would not let him have it. Ley then went to Chicago for the purpose of borrowing money on the mine, but was unable to do so. When he returned to St. Louis he tried to sell me the property. My brother told me that he was a stockholder in a corporation which was operating the mine under a lease for one year and that it had an option to purchase the property during the year. Ley offered me the property for $8,000. My brother told me all about the option contract his company had and advised me to buy the mine, saying that it was worth what his company had agreed to pay for it. Ley also advised me to buy the mine and said that it would be a splendid investment. On the 8th day of December, 1915, I got a ten-days' option in writing from Ley for the purchase of the mine. My attorney sent my brother to Yellville to compare the copies of the abstract and lease and option held by the Bank of Yellville. Upon his return I consummated the sale with Mr. Ley and paid him $8,000 in cash for the property. I had no agent. I made the deal myself direct with Mr. Ley in my attorney's office in the city of St. Louis. My attorney was not the attorney for the lessee of the mine, but was an attorney who sometimes transacted private business for my brother. I purchased the property for myself with my own money. I bought the property because I thought it was a fine investment and the chance of a lifetime to make some quick money. I purchased the property from Mr. Ley because I believed him and believed that it was

a good buy, and especially so on account of the lease and option to the St. Louis Zinc & Lead Company. My brother also believed it would be a fine buy for me. Both my brother and Mr. Reiter told me it was fine property. Before I purchased the property Mr. Reiter was managing it for the lessee. My brother was the chief stockholder in the corporation operating the mine under the lease. After I acquired the property, Mr. Reiter remained in possession for the St. Louis Zinc & Lead Company until it failed to go on with the work. He did do some business for me in relation to the property, such as paying the taxes, etc. Soon after I purchased the property the lessee surrendered the possession of it to me and Reiter became my manager in operating the mine. During the time the lessee was operating the mine I was informed that its engineer was wasting a large amount of money on the mine. My lawyer requested my brother to compare copies of the title papers and escrow agreement with the originals in the Bank of Yellville. Mr. Reiter and Mr. Ley were going back to the mine and went with my brother to Yellville. My brother reported that the papers were true copies. Ley executed a quitclaim deed to me to the property in controversy. He also executed a bill of sale to the machinery and other property.

It was shown in evidence by the plaintiff that he was informed that there was a fraudulent scheme on foot to cheat him out of his commission and that his attorney wrote to Ley and to the other parties interested with regard to the matter. Reiter had informed Ley that R. A. Grund of St. Louis, Missouri, was the attorney for Mabel A. Sanders and a letter was then written to him. He answered, pleading the press of other business engagements, and put Berry off until he could examine the matter and let him know the facts thoroughly. In the meantime, after receiving the money, Ley left the country and has not been back since.

Other facts will be stated and referred to in the opinion.

The chancellor found that the conveyance by Ley to Mabel A. Sanders was a simulated one and that it was made to her for the benefit of her brother, who was the real party in the transaction, in order to defraud Berry out of his commission under the lease and option contract. The defendant, Mabel A. Sanders, has appealed.

*Williams & Seawel,* for appellant.

1. The lower court erred:

(1) With reference to its action on the pleadings, and (2) with reference to its findings of facts and application of law thereto.

Appellant demurred to both the original and amended complaint and to the cause of action after plaintiff (appellee) had elected to treat her as trustee. She did not waive her demurrer by pleading over, because the plaintiff wholly failed to state a cause of action against her and she expressly reserved her exceptions to the ruling of the court on demurrer. 8 Ark. 74; 18 *Id.* 304; 107 *Id.* 285.

According to the allegations of the complaint as *controlled by the exhibits* thereto appellant bases his right of recovery upon the *sale* of this property for an agreed sum. There is no allegation that a sale was either made or prevented. The only allegation is that under such contract an *option to purchase* was duly executed by the principal of appellee. The exhibits control the averments of the complaint. 104 Ark. 459; 33 *Id.* 722; 94 *Id.* 372.

It is well settled that the commission claimed by a real estate broker is not due until performance by him of the contract of employment. In this case no performance is alleged. The allegations do not charge a liability either against Ley, the principal, or against appellant. 9 Corp. Jur. 604; 204 U. S. 228; 44 S. W. 819; Walker, Law of Real Est. Ag., § 85; Gross on Real Est. Brokers, p. 158, § 149; 111 S. W. 779; 106 *Id.* 1152.

Neither appellant nor her land were liable for a commission never earned. 104 Ark. 459-464; 204 U. S. 228; 104 Ga. 157; 70 *Id.* 56; 54 N. E. 418.

Her purchase was subject to the lease and option. This the vendor had a right to make and the vendee and appellant to purchase. 116 S. W. 494; 39 Cyc. 1233; Walker, Law of Real Est. Agency, § 91; 56 Atl. 455. There is nothing in the acts charged that would create or establish either a personal liability or fix a charge of trust on her land. 103 S. W. 417; 128 *Id.* 944; 136 *Id.* 1118; 81 Ark. 96. To impress a trust upon property and hold the possessor of the legal title as a trustee, it is necessary to allege and show an equitable right to the title or property. 126 Ark. 61, 65.

Because a party is dissuaded from accepting an offer through the interference of .a third person affords no basis for recovery in law or equity, no matter whether the motives be good or bad. Until there is an acceptance of an offer there is no contract and no cause of action exists. 103 S. W. 417; 128 S. W. 944; 136 *Id.* 1118.

2. There is absolutely no evidence that sustains the findings of fact nor is the decree supported by any principle of law or equity.

*J. C. Floyd,* for appellee.

1. Appellant can not now for the first time complain of the action of the court on the pleadings, as she did not except at the time nor have her exceptions noted of record. She has waived all her rights to complain. 127 S. W. 708; 3 Ark. 207; 19 *Id.* 194; 1 Ark. 38. See also 85 Ark. 246; 107 S. W. 1177. The rule governing pleadings has no application here. 74 Ark. 572, 86 S. W. 1008; 22 Ark. 524.

2. The liability of defendant, James C. Ley, rests upon a special contract for services rendered in behalf of his principal in securing an executed contract of lease with option to purchase which is binding on the lessor during the full term thereof. 87 Ark. 506, 113 S. W. 35; 39 Cyc. 1247 L; 89 Ark. 289, 116 S. W. 662; 9 Cyc. 287 (b).

3. Ley became liable to appellee for his commission stipulated and the price he paid for the property is immaterial. 44 L. R. A. 349 (b), and note; 104 Iowa, 487; 92 Cal. 33-37

4. The sale by Ley to Mabel A. Sanders was by the consent and connivance of the St. Louis Zinc & Lead Company and for its benefit or the benefit of its stockholders and with the fraudulent purpose of defrauding him of his commission. If a principal, in order to defraud the broker of his commission, conveys to a third person for the customer found by the broker the broker may sue for the commission and is not compelled to sue for or bring an action of fraud. 9 C. J. 633, par. 106; 19 *Id.* 272, par. 2; 95 N. Y. App. Div. 154, 88 N. Y. Supp. 472.

The liability of Mabel A. Sanders to appellee rests wholly upon principles of equity which make her a trustee for the payment of the commission $2,000 for services rendered, and he is entitled to a lien. 3 Pom. Eq. (4 ed.), § 1044; 32 L. R. A. 298; Bispham, Eq. (4 ed.), § § 91-3, 218; 130. U. S. 122, 128; 151 U. S. 1, 25-27; 181 *Id.* 77, 89; 11 Enc. U. S. Rep. (Michie), 692; 39 Cyc. 172, subd. 6.

As to officers buying corporate property, see 21 Wall. (U. S.), 616; 10 Enc. Dig. Ark. Rep. (Michie), 323; 73 Ark. 310; 83 S. W. 910; 105 *Id.* 74; 121 *Id.* 1059; 11 *Id.* 479; 84 *Id.* 505.

5. A broker who is the "procuring cause" of a sale is entitled to his commission, although the actual sale is another cut wound on his elbow, almost right in the elbow made by his principal. 45 S. W. 418; 73 Ga. 295-301; 78 Tex. 92; 44 L. R. A. 350, note 5; 29 S. W. 46.

HART, J., (after stating the facts). It is first insisted by counsel for the defendants that the court erred in certain respects in its ruling on the pleadings. But little need be said in regard to this phase of the case. Chancery cases are tried *de novo* on appeal. The amended complaint is too long to set out at length in this opinion. We have carefully considered its provisions, however, and have reached the conclusion that the allegations are broad enough to warrant the relief granted by the chancellor provided they are established by a preponderance of the evidence.

(1)   The principal issue in the case is whether or not the proof shows that the real transaction was between Ley and A. W. Sanders and that the conveyance of the property to Mabel Sanders was colorable merely for the purpose of defrauding the plaintiff, Berry, out of his commissions in the sale of the property.   The law requires good faith in every business transaction and does not allow one party to intentionally deceive another by making false representations or by concealments.   Fraudulent schemes are usually planned in secret and executed in the dark.   For this reason it is oftentimes a matter of great difficulty to determine what one's motive may have been for this or that particular action.   What you do and not what you say is often the key to open the door of your mind.   Therefore, upon the issue of fraud, such as here raised, the plaintiffs should be permitted to thoroughly sift the transaction and to explore the entire field and to show any conduct and circumstances from which an inference of fraud may be legally inferred.   It has been said that falsehoods are the ghosts of truth; the masks of faces.   Another philosopher has said that a lie always needs a truth for a handle to it.   The truth of these maxims is well illustrated in the case at bar.   It is not to be doubted that Mabel A. Sanders had the right to purchase the property in question for her own use and benefit, and that if she did so, the property should not be burdened with a lien for Berry's commission.   The bald testimony of Mabel A. Sanders tends to show that she purchased the property in good faith for an investment; but when her testimony is read and considered from its four corners, the court thinks it is contradictory and inconsistent with itself, and when viewed in the light of the attendant circumstances warranted the chancellor in finding that the sale to her was colorable merely and that the real sale was to her brother, A. W. Sanders, the title being put in her name for the purpose of defrauding Berry out of his commission in making the sale.

Mabel A. Sanders lived in Los Angeles, California, and was on a visit to her brother in St. Louis, Missouri,

when her connection with the transaction commenced. She had never heard of the Nakomis mine and did not know any of the parties connected therewith except her brother. She first said that her brother told her about a company in which he was the principal stockholder, leasing the land for one year and taking an option for the sale of it for the same time for the sum of $20,000. She stated that he told her that it would be a good way for her to make money quickly because his company would likely exercise its option during the year and that in that event she would receive $20,000 for the property less $2,000 commission, which would go to Berry. It is perfectly evident from her acts and conduct that she did not expect the lessee to exercise its option during the year. The lessee surrendered possession of the property to her soon after she purchased it and the same manager continued to operate the mine. The taxes were due just after she purchased the mine and the same manager attended to the payment of them for her. She made no effort to get the lessee to exercise its option to purchase at $20,000 or even for a reduced price. She acquiesced in it giving up its lease when by its terms it ran for a year. The lease was a profitable one to her and she could have compelled the lessee to have carried out the lease and operated it for the balance of its term. She knew her brother was the principal stockholder in the lessee corporation and was managing it and yet permitted it to surrender possession without an effort to induce it to exercise its option to purchase the property. If she had been induced by her brother to purchase the land upon the faith that his corporation would exercise its option to purchase during the term of its lease, it is perfectly natural that she would have made some effort to induce him to carry out his promise.

It is equally unreasonable to say that she bought it for an investment. She said that both her brother and Ley told her that it was a fine investment and that she thought there would be a good profit in the investment. At the same time she admits that she had been informed

that the engineer on the property was wasting a large amount of money on it. She said that she acted independently in purchasing the property and made the deal directly with Mr. Ley at her attorney's office. Her attorney was a stranger to her and was an attorney who some times transacted private business for her brother. She did not visit the mine either before or after its possession was surrendered to her by the lessee. She knew that a good deal of money had been wasted in operating it, and yet continued its operation under the same management. She returned to her home in California without ever going to see the mine. She says that she paid Ley the purchase price in cash. He was a stranger to her and this was a suspicious circumstance in itself. Ley immediately went to a distant part of the country and has not since returned to Arkansas. Berry was informed that there was a scheme on foot to cheat him out of his commission and immediately wrote to that effect to all the interested parties. Such a letter was written to the attorney of Mabel Sanders on the 29th day of December, 1915, and was duly received by him. He did not answer the letter until January 12, 1916, and asked for a delay until he could investigate the matter thoroughly. This was inconsistent with the statement of Mabel A. Sanders that she made the purchase direct from Mr. Ley without the help of her brother. If such had been the case it would have been easy for her attorney to have so replied at once. There would have been nothing to investigate. Mabel A. Sanders admits that her attorney sent her brother down to Yellville to examine the lease and option contract and papers deposited therewith for the purpose of seeing that the copies of them were true ones. As we have just seen, the circumstances all point to the fact that the lessee corporation did not intend to exercise this option and on that account it could make no difference to her about what the terms of that instrument might be. If the transaction with Ley was in good faith, she would acquire the title to the property. It is evident that an examination of these papers was made for the purpose of

knowing exactly what the obligation of the parties to Berry might be. If Mabel A. Sanders was to receive in good faith the title of Ley to the property, it could make no difference to her what the papers placed in escrow in the Bank of Yellville contained, for even if the lessee corporation exercised its option to purchase she would only have to pay $2,000 commission to Berry and she knew that everything in excess of the price she was to pay for the property and the amount of Berry's commission would be profit to her. It would make a difference to her brother, however, to know the exact terms of the option so that he would know definitely whether he could purchase the property in his own name and escape the payment of commissions to Berry. A. W. Sanders could not have purchased the property in his own name without violating the conditions upon which the lessee corporation was organized. Ley, Sanders and Reiter all went down to examine the papers together. While there, Ley told the president of the bank, who was the brother-in-law of Berry, that the property was about to be sold and that Berry would get his commission right away. At the time Reiter came down to record the deed from Ley to Mabel A. Sanders, he told Berry that the deal was made with Mabel Sanders for the purpose of protecting her brother, A. W. Sanders, in the money that he had expended on the mine under the management of Hamilton and Goldman. He said that A. W. Sanders had been out something like $5,000 in this way. The deed to Mabel Sanders was executed on December 8, 1915, and this case was tried in the spring of 1919. During all this time, so far as the record discloses, Mabel Sanders did not visit the mine, or try to sell it, although she says she bought it for resale for a quick return on her money. She made no complaint to her brother that the option of his company to purchase was not exercised. Reiter was the trusted agent of her brother. Neither of them testified in the case. It is true the burden of proof was upon Berry to show concerted action and collusion on the part of the defendants; but the court is of the opinion that this

has been done, and that the record, when read and considered from its four corners and viewed in the light of the attendant circumstances, shows that Mabel Sanders was a mere figurehead, and that the real transaction was with A. W. Sanders, the principal stockholder of the lessee corporation and the manager and director of its affairs and policies.

(2-3)  But it is claimed that the statements of Ley to Layton in the presence of Reiter and Sanders and the statement of Reiter to Berry when he came down to file the deed from Ley to Mabel Sanders for record are not admissible.  Of course, concert and collusion on the part of A. W. Sanders, Mabel Sanders and Reiter to cheat Berry out of his commission must be established before their declarations made in the absence of Mabel Sanders would be binding upon her.  When the connection of individuals to accomplish a fraud is shown, every act and declaration of each member of the conspiracy, in pursuance of the original concerted plan and with reference to the common object, is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each of them.  Care must be taken that the acts and declarations thus admitted, be only those which were made and done during the pendency of the fraudulent enterprise, and in furtherance of its objects. If they took place at a subsequent period, and are, therefore, merely narrative of past occurrences, they are to be rejected.  *Clinton* v. *Estes,* 20 Ark. 216, and Jones' Commentaries on Evidence, vol. 2, sec. 254 (255).

We think the charge of collusion between these parties to cheat Berry out of his commission is established by the facts and circumstances introduced in evidence, when considered in connection with their acts and conduct.  The transaction was not regarded ended until Reiter had filed the deed for record.  He and A. W. Sanders were active participants during the whole course of the transaction.  Reiter was manager of the mine and the confidential agent of A. W. Sanders while his company was operating the mine.  He went with A. W. Sanders to

examine the escrow papers in the Bank of Yellville. He advised with the parties about the condition of the mine. He carried the deed from Ley to Mabel Sanders and filed it for record. He at once commenced to pay the taxes for her. The associates of A. W. Sanders became angry and charged him with bad faith when they found out about the conveyance to Mabel Sanders. This indicates a belief on their part that A. W. Sanders, the principal stockholder of the lessee corporation, was on a deal for the property under cover, and in violation of their rights, and did not intend that the lessee corporation should exercise its option to purchase the mine. Reiter continued right along in charge of the mine. Hence the court thinks that the declarations were made in the prosecution of the common object and before the termination of the unlawful enterprise. Therefore, so far as concerns the transaction for which the combination was formed, the parties were identified in interest and motive and what one said in the conduct of the matter may be used as evidence against the others.

It follows that the decree will be affirmed.

HUMPHREYS, J., not participating.