NATIONAL LIFE & ACCIDENT INSURANCE COMPANY, INC.
*v.* HITT.

4-4736

Opinion delivered October 11, 1937.

*Barber & Henry* and *John B. Thurman,* for appellant.

*Frankel & Frankel,* for appellee.

GRIFFIN SMITH, C. J. This appeal is from a judgment rendered on a verdict of nine jurors who found for the plaintiff on a complaint filed November 23, 1936. Plaintiff-appellee alleged that on November 1, 1932, appellant issued to him its policy of insurance, under the terms of which the assured was entitled to $20 per week in the event he became totally disabled. It is alleged that appellee became totally disabled on March 1, 1933; that on March 12 he was paid $120, and again, on May 5, 1933, was paid $140, such payments being the amount due for thirteen weeks of disability; that by reason of wrongful information and misrepresentations regarding his physical condition, he was induced to surrender the policy on May 5th, at the time payment of $140 was made; that the wrongful information was given and the misrepresentations made by appellant's agent and physician; that appellee has been unable to perform his duties from March 1, 1933, and has remained totally disabled during the contract period of the policy; that he was confined to his bed and was unable to walk without the aid of a cane or the assistance of some one; that from March 1, 1933, he has been suffering from arthritis, a stiffness of the spine, and heart trouble, and is still so disabled. The judgment was for $1,800, covering 90 weeks of disability in addition to the payments previously made; an attorney's fee of $250; penalty of $216; and interest at 6 per cent. on $1,800 from March 11, 1935, to the date of judgment, amounting to $219.90 —a total of $2,485.90.

In testifying as to his condition and the circumstances attending settlement with appellant, appellee said:

"Prior to February, 1933, I was in perfect health, but about February 25, 1933, I went to the Veterans' Bureau and was advised to go to the hospital. I became ill with pains in my back, hernia and fistula, and had to go to bed and wasn't able to go to the hospital. Between February, 1933, and up to date, I have continuously taken sedatives which in a good many cases eased my pain, and at the same time dulled my mind and left

it in a daze. In February, 1933, I was working for the National Life & Accident Insurance Company. This company wrote a group policy on its employees and I was covered by this policy, paying half the premium and the company paying the other. I was given a certificate of insurance providing for $20 a week for one hundred and four weeks total disability. I have another policy with the company and at the time it was issued I was examined by Dr. Jobe.

"At the time I became totally disabled, around March 1, 1933, Mr. McAllister, the superintendent, and Dr. Jobe came out to see me, and Mr. McAllister kept trying to get me to make a lump sum settlement. The company paid me for six weeks. I imagine Mr. McAllister suggested having Dr. Jobe come out. I met Dr. Jobe when he was working for the company. Dr. Jobe had examined me before I went with the company, and was representing the company. Dr. Jobe would examine applicants for the company. I can't be sure whether I called Dr. Jobe or Mr. McAllister brought him along, but am of the opinion Mr. McAllister brought him or sent him out. I did not receive a bill from Dr. Jobe. Dr. Jobe told me I had colitis and the rest was more mental than anything else. During this time the company was trying to settle with me and I settled about May 5, 1933. Dr. Jobe was the company's physician and I had confidence in Mr. McAllister and took their word there would not be anything wrong. If I had thought I was totally disabled I wouldn't have accepted the $140. I had seen Mr. McAllister on several occasions and Mr. McAllister said if there was anything wrong the company would take care of me. I surrendered the policy and stayed in bed until around the middle of July, then began to drag along a little. Would complain about these different ailments, but they would say it was only my mental attitude. I made this settlement on that account. If I had known I was totally disabled, I wouldn't have made the settlement. I had been in the insurance business a long time and made the settlement because I had been sick for a long time and my

wife and children needed food and I had to take medicine and medicine cost money, and, as I had been sick, we didn't have any money.

"The last part of August, 1933, I went to work for the Reliable Life & Accident Insurance Co., carrying a debit. I spent one-half of my time at work, the other at home, working there until December, and I played out again. I worked as a bookkeeper for the County Relief Office from January to April, 1934. Mr. White did most of my work. I was suffering continuously, but couldn't go to bed, as I had to take care of my family. In April I went on the road and tried to sell magazines. I was out about one-half the time. I did this until about September. In September, 1934, I went to work for the Life & Casualty Company. One of its agents helped me to do my work. In the latter part of August, 1935, until November, 1935, I went with the Union Life, doing the same work. One of the agents helped me do my work. I was not able to do all of the substantial things which I had done with the National. My physical condition was getting worse all the time. I worked until November 30th and had to go to bed. Dr. S. F. Hurle treated me regularly every week or two. From 1933 to 1935 I thought I would get well. I was taking drugs when I made the settlement. About December 6, 1935, I went to the Veterans' Bureau where I had my tonsils taken out. I stayed there thirteen or fourteen weeks. I had a hernia, but my physical condition would not permit an operation. A few months after the tonsil operation, my neck and back was practically ossified. I have the same pains now as I had in 1933. I learned I was totally disabled in March, 1936. I am now drawing $30 a month from the Government as total disability. I surrendered the National Life & Accident Company policy because of the fact they misrepresented my condition. McAllister and the company doctor both said I would be all right, that it was my mental condition. If I had thought I was totally disabled, I would never have turned the policy loose. I now spend part of my time in my wife's news stand, mostly looking after the finances."

The compromise check indorsed by appellee was introduced. It bore the indorsement: "In full settlement of claim under Certificate No. 3894, Employees' Insurance."

If, in fact, appellee's total disability dates back to May 5, 1933, and settlement under the policy was induced through erroneous information given appellee by Dr. Jobe at a time when the physician was acting for the company, or by the fraudulent conduct of Superintendent McAllister, this appeal should be affirmed.

Four subjects of primary importance were included in the proceeding: (1) Whether appellee was totally disabled at the time indicated; (2) Whether the disease occasioning such disability is the same disease now complained of; (3) Whether appellee knew what his real condition was, or as a reasonable person should have known; (4) Whether [assuming that the total disability now complained of did exist in May, 1933] appellee, with knowledge of disability, voluntarily settled with appellant and surrendered the certificate; or, being disabled, and such disability having been continuous, was appellee imposed upon by appellant's agents and induced through fraudulent representations or erroneous statements to enter into a compromise which yielded compensation for the relatively insignificant sum?

As was said in *Sanders* v. *Berry*, 139 Ark. 447, 214 S. W. 58, "The law requires good faith in every business transaction, and does not allow one party to intentionally deceive another by making false representations or by concealment." In *Lone Rock Bank* v. *Pipkin*, 169 Ark. 491, 276 S. W. 588, we said: "If the means of information as to the matters represented is equally accessible to both parties, they will be presumed to have informed themselves; and, if they have not done so, they must abide the consequences of their own carelessness."

Tested by this rule, and because of the indefinite nature of appellee's evidence as to what representations were made to him by McAllister, and in view of appellee's own experience as an insurance agent, it must be held that appellee was not justified in relying upon ex-

pressions of opinion by a layman. In short, appellee, with respect to his own physical condition, will be presumed to have been as well informed as McAllister, and no fraud can be predicated upon what appellee says McAllister told him as to the nature and extent of the disability. On the contrary, appellee volunteered the information that in February, 1933 — approximately three months before the conversations—he went to the Veterans' Bureau and was advised to go to a hospital. Appellee says that the pains he is now experiencing are "exactly the same, or worse," than those complained of in 1933, but he did not learn that he was totally disabled until about March, 1936.

To determine whether the settlement should be set aside, we must scrutinize the conduct and determine the status of Dr. Jobe—this for the reason that in numerous cases we have decided that an injured person will not be held to the terms of an improvident settlement where such person relied upon information supplied by a physician acting for the offending agency, which information or diagnosis was subsequently shown to have been incorrect, though made without fraudulent intent.

This case, therefore, turns upon whether Dr. Jobe, in making the examinations of appellee and advising with him, was the agent of appellant.

At the time Dr. Jobe was offered as a witness for appellant, appellee's attorney made this objection: "If Dr. Jobe is Mr. Hitt's physician, we object to his testimony." The court then remarked: "It is a question of whose physician he was. I thought you (appellee) contended he was the company's physician," to which appellee's attorney replied: "He can't testify to anything he did for Mr. Hitt."

From this colloquy it will be seen that appellee claimed the right to testify to what Dr. Jobe had told him, but insisted that appellant did not have a right to use the doctor as a witness for the purpose of testifying *to anything he did* for appellee, although, at least inferentially, he was conceding that the doctor might testify as to conversations. This would create a somewhat

anomalous situation, inasmuch as exclusion of the testimony could only be based upon the confidential relationships with which the law clothes physician and patient.

Appellee testified he was not sure that Dr. Jobe called upon him at his (appellee's) request, or whether McAllister brought the doctor along, but he was "of the opinion McAllister brought or sent the doctor." The company required as a condition precedent to employment that all agents should submit to a physical examination, and before or at the time appellee went to work for appellant he was examined by Dr. Jobe. He also carried another policy of insurance with the appellant company, as to which there is no controversy here, and Dr. Jobe made examination for the company incident to such policy. Appellee further testified that he worked for the Union Life Insurance Company after severing his connections with appellant, and continued in the latter employment until November 30, 1935.

"Q. Did you have a physician or medical attention during that time? A. Yes, sir.

"Q. Who were your physicians? A. I had Dr. Jobe and Dr. Hurle, and Dr. Hogue had a laboratory test for Dr. Jobe around April, 1933, I think."

Appellee remained in the Veterans' Hospital from December 11, 1935, until August 25, 1936.

Dr. Jobe testified positively that he was called by Mrs. Hitt; that he was not employed by appellant to treat or advise with appellee, and that his bill had been charged to Mr. Hitt, as reflected by his books.

We are of the opinion that there was no substantial testimony to sustain appellee's contention that Dr. Jobe was appellant's agent for the purpose of advising with appellee as to the status of his health on May 5, 1933.

Chronological sequence of appellee's activities is highly persuasive of appellant's contention that there was no intentional or careless deception. After accepting the settlement, appellee, during the latter part of August, 1933, went to work for the Reliable Life & Accident

Insurance Company, and continued with the company until December. In January, 1934, he secured employment as a bookkeeper in the Pulaski County Relief Office and worked until April, then went on the road selling magazines until September. He was subsequently employed by the Union Life Insurance Company. In 1934 he applied to the Mid-Continent Life Insurance Company for insurance and in the application stated that he was in good health. Appellee explained this by saying the state manager of the Mid-Continent was a friend of his and needed some additional business, and he signed the application to help the agent, but did not know what representations were made as to the condition of his health.

In 1935, while appellee was working for the Union Life Insurance Company, he was issued two life insurance policies, based upon applications made out entirely in his own handwriting. In the applications, appellee said that he was in good health, and had not consulted a physician within the past two years.

J. M. Hester, manager of the Reliable Life Insurance Company, testified that appellee was employed by his company in July, or the last of June, 1933, as agent. His duties were to solicit new business, collecting on a regular debit, and adjusting claims; that appellee worked regularly until the last of December; that the work required a great deal of walking, and appellee performed his duties. Appellee quit of his own accord and did not mention total disability.

N. E. Blasingame testified that he was formerly an agent for the Life & Casualty Company; that appellee went to work for that company on September 8th or 10th, 1934, and worked until July, 1935, writing business and paying claims. "I was in the office with him each day, and, as far as I know, he performed the services of an agent during the time he was with the company. I couldn't say I heard him say he was disabled, as he did his work. I did hear him mention being sick a time or two in the office several times, but didn't observe him lose any time from his work."

Clifford Jordan, manager of the insurance department of Union Life Insurance Company, testified that he employed appellee, who worked for the company from August, 1935, until December, and "during that time he worked regularly and I have no recollection of hearing him complain of suffering any illness or disability." The witness testified that as agent appellee had authority to take applications for insurance. The applications made out by appellee, wherein he applied for insurance on his own life, were introduced by the witness, one for $500 bearing date of August 26, 1935, and one for $300 having been written subsequently. The company accepted at face value statements by the applicant that he was in good health and had not consulted a physician within two years, and policies were written. Referring to one of the applications, the witness testified: "This is the original, and was written entirely by Mr. Hitt and signed by him. He did both. From July, 1935, until December, he worked regularly for the company."

Dr. J. R. Wayne testified that he had known appellee for less than a month. Examined him March 2, 1937, and found him suffering from arthritis, with deformity in the neck and back; heart not compensating properly. "He has arthritic condition of his back and complained of a pain in the abdomen with colitis. Has crepitus. Mr. Hitt may have been totally disabled since March, 1933. It can vary. It can come on in a short period of time and a longer period of time. Arthritis sometimes begins in childhood. It can go back quite a length of time or it can come on within a reasonable time. The infection has usually extended over a period of many years and usually in later life the deformity comes on. You can have acute arthritis within a period of a few months. When you get calsification, as appellee has in his neck and spine, that is over a period of a good many years."

In *Jarrett* v. *Langston*, 99 Ark. 438, 138 S. W. 1003, we said: "To be fraudulent, representations must be made by one who either knows them to be false; or else, not knowing, asserts them to be true, and made with

intent to have the other party act upon them to his injury, and such must be their effect.''

Corpus Juris, vol. 26, p. 1131, states the following rule as to fraud: ''An honest but erroneous expression of opinion or belief is not fraud. Since a statement concerning a matter not susceptible of exact knowledge by the speaker is no more than expression of a belief, one making such a statement in good faith is not liable for its falsity. The rule may apply, although the statement was made in terms of positive personal knowledge, the test being the character of the facts asserted to be true rather than the form of the assertion.''

A recent decision by the Circuit Court of Appeals for the Eighth Circuit, *Pacific Mutual Life Insurance Co. of California* v. *Jacob,* 87 Fed. (2d) 870, held that a mutual mistake of the insurer and the insured as to probable future duration of insured's disability would not justify cancellation of an agreement compromising and settling claim for disability benefits and cancelling disability clause of a life policy.

This court held in *Phoenix Utilities Company* v. *Smith,* 185 Ark. 587, 48 S. W. (2d) 238, that a release is not binding on the releasor where the physician of the party responsible for an injury represents to the injured person that his injuries are temporary when in fact they are permanent, and where the injured person executes a release relying upon the statements of such physician.

In that case the appellee, plaintiff below, sustained a serious injury, and was treated at his home by a physician furnished by the Phoenix Utilities Company. Later he was taken to a hospital and operated upon. Nine days after the operation the company's adjuster visited appellee at the hospital for the purpose of settling any claim for damages. Appellee stated that he was not ready to settle, and would not do so until he had consulted his doctor. The adjuster then suggested to appellee that he see his doctor, and stated that he would return the following Friday. On the day this conversation was had, the doctor who had performed the operation under employment by the company called

on appellee at the hospital. Appellee told the doctor that the adjuster had called, and said, "I would like to know how long it will be before I will be able to go to work." According to appellee's testimony the doctor replied, "You will be able to go back to work in three months. You will be just as good as you ever were, or maybe stronger." Based upon this and corroborating testimony as to representations made by the doctor, this court affirmed a judgment for $3,000, the effect of which was to set aside the settlement, made for $400. The opinion contains this statement: "There is no contention that Dr. Tribble intentionally deceived appellee or practiced any fraud upon him, but the testimony supports appellee's contention that he relied upon the doctor's opinion as to his recovery, and that the doctor was mistaken in his prognosis."

This declaration of the law has been consistently followed, and the justness of its application to that class of cases which come within the rule cannot be seriously questioned.

Appellee, in the case at bar, was in no sense inexperienced. For eleven years he had been employed by insurance companies, and he must have understood the business and the reasons for and effects of settlements. "Disability" was not a term unknown to him, and the degree of physical impairment required to establish liability under the terms of a policy or certificate such as he carried necessarily was discussed by him on many occasions with claimants against companies he represented.

After settling with appellant, more than three years elapsed during which no premiums were paid on the policy because he regarded the transaction as closed, admitting no liability to the company, and claiming none from it to himself. He repeatedly consulted physicians, as reflected by his own testimony. He was again employed in the same kind of business, and the record indicates that he quit of his own accord. His services had not been complained of, nor was there a showing other than by appellee's own testimony that he was not able

to perform all of the essential duties required of one in his profession.

The verity of appellee's testimony is open to question. He declared, in making application for insurance in the Mid-Continent Company, that he was in good health, but explained that he signed the application in order to help a friend "make a showing." The effect of this transaction was to perpetrate a fraud upon the insurance company. This is lightly brushed aside with the inference that such practices are frequent. In 1935 appellee was still representing himself to be a well man, and applied for two policies of insurance in another company. His statements then made as to the condition of his health may have been mere expressions of opinion, but the additional assertions that he had not consulted a doctor within two years, being untrue, go vitally to the question of his credibility.

There being no substantial evidence upon which the jury could have based a finding that Dr. Jobe was appellant's agent at the time in question, the judgment must be reversed, and the cause dismissed. It is so ordered.

MEHAFFY, J., concurs.