CRUCE *v.* MISSOURI PACIFIC RAILROAD COMPANY.

Opinion delivered December 22, 1924.

1. TRIAL—DIRECTING VERDICT.—In determining on appeal the correctness of the trial court's action in directing a verdict, the rule is to take that view of the evidence that is most favorable to the party against whom the verdict is directed, and, where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it was error to take the case from the jury.

2. TRIAL—DIRECTING VERDICT.—In an action against a railroad company for personal injuries to a locomotive fireman caused by negligence in not having the tool rack in the locomotive properly inspected and repaired it, it was error to direct a verdict for defendant where there was evidence tending to prove that the company was negligent in not having the tool rack properly inspected and repaired, that the tool rack was in a defective condition, and such defect was the proximate cause of the injury to plaintiff, that plaintiff did not appreciate the danger, and that the danger was not one of the ordinary risks of the employment.

3. TRIAL—DIRECTING VERDICT.—Where there are issues of fact on which reasonable minds might reach different conclusions, it was error to direct a verdict.

Appeal from Jackson Circuit Court; *Dene H. Coleman*, Judge; reversed.

*John W. Stayton* and *Brundidge & Neelly*, for appellant.

The proof was sufficient to show that the train upon which plaintiff was injured was engaged in interstate commerce.    117 Ark. 44; Ann. Cas. 1916B, 482; 60 L. ed. 868.    A servant assumes the ordinary risks and dangers of his employment, and the extraordinary risks and dangers which he knows and appreciates.    245 U. S. 441; 38 Sup. Ct. 139; 63 L. ed. 385; 153 Ark. 77; 160 Ark. 362; 66 L. ed. 482; 147 Ark. 75.    The doctrine of *res ipsa loquitur* applies in this case.    286 Fed. 663; 222 N. Y. 482; 119 N. E. 86; 233 U. S. 80; 34 Sup. Ct. 566; 58 L. ed. 860; 228 U. S. 233; 33 Sup. Ct. 416; 57 L. ed. 815; Ann. Cas. 194 D, 905; 166 N. Y. 188; 59 N. E. 925; 52 L. R. A. 922; 82 Am. St. Rep. 630; 211 N. Y. 203; 105 N. E. 206; 51 L. R. A. (N. S.) 1221; Ann. Cas.

1915C, 511; 167 Fed. 16; 92 C. C. A. 478; 114 Fed. 737; 52 C. C. A. 369; 132 Fed. 801; 65 C. C. A. 101; 149 Fed. 667; 82 C. C. A. 115; 8 L. R. A. (N. S.) 677; 80 Fed. 865; 26 C. C. A. 201; 132 Fed. 593; 67 C. C. A. 421; 139 Fed. 737; 71 C. C. A. 555; 123 Fed. 61; 59 C. C. A. 279.

The court erred in giving a peremptory instruction for the defendant.   89 Ark. 372; 103 Ark. 401.

*Pryor & Miles,* for appellee.

In an action by a servant against a master for alleged negligence, where the servant is in an equal or better position than any other person to know what constituted the negligence, the doctrine of *res ipsa loquitur* does not apply.   169 Fed. 609; 218 Fed. 604; 96 Ark. 206; 32 Okla. 575.   The doctrine of *res ipsa loquitur* does not apply as between master and servant.   201 Fed. 637; 138 Ill. App. 131; 229 Fed. 559; 181 Fed. 91; 67 C. C. A. 421; 132 Fed. 593; 139 Fed. 737; 152 Fed. 417.   Conjecture is an unsound and unjust foundation for a verdict.   98 C. C. A. 281; 174 Fed. 377; 76 C. C. A. 201; 145 Fed. 327; 105 Wis. 311; 148 Pa. 180; 23 Atl. 989; 15 L. R. A. 416; 101 Wis. 371.   See also the following cases on the doctrine of *res ipsa loquitur:* 79 Ark. 76; 87 Ark. 190; 87 Ark. 321; 91 Ark. 388; 96 Ark. 500; 100 Ark. 422; 79 Ark. 437; 100 Ark. 467; 101 Ark. 117. There was no error in directing a verdict in favor of the defendant.   41 Ark. 542; 68 Ark. 316; 95 Ark. 136; 97 Ark. 486; 100 Ark. 156.

WOOD, J.   C. M. Cruce was a fireman in the employ of the Missouri Pacific Railroad Company.   On the 12th of June, 1922, while engaged in the performance of his duties as fireman on one of the company's locomotives running from Little Rock to McGehee, he was injured by a tool-box falling upon him.   The train, at the time of Cruce's injury, was engaged in interstate commerce. Cruce instituted this action on September 13, 1923, to recover damages for the injury, and alleged that, while he was in a stooping position, putting coal in the furnace, the tool-chest fell from the rack in which it was placed, upon his back with great force and violence, causing him

severe injury; that the company, its agents and employees, negligently and carelessly permitted the tool-rack, which was constructed above the place where his duties required him to work, to become out of repair and insecure, in that the same was bent or broken and did not have the proper fastening to hold the tool-box in position; that the company, its agents and employees, in placing the same in said rack had negligently and carelessly failed to see that it was properly adjusted so that it would not be thrown from its position by the movement of the train; that the company, its agents and employees, had negligently and carelessly failed to make the proper inspection of the placing of said tool-box in the rack in order to see that the same was not an element of danger. The action was brought under the Federal Employers' Liability Act, approved April 22, 1908.

.The company in its answer denied all the material allegations of the complaint, and set up the affirmative defenses of contributory negligence and assumed risk.

The testimony of Cruce was to the effect that, on the morning of June 12, 1922, he was firing an engine that was pulling a freight train from McGehee to Little Rock; that this train was made up in Louisiana.

The testimony on the issues of negligence, contributory negligence and assumed risk, is substantially as follows: The engineer testified that the injury to Cruce occurred at Jefferson Springs, about seventeen miles from Pine Bluff, between Pine Bluff and Little Rock. The groaning of Cruce attracted witness' attention, and he looked around and saw that the tool-box was lying, one end on the apron and the other on Cruce's shoulder. Cruce was lying down in the entry, on his side. The tool-box had fallen out of the rack on Cruce, and witness lifted it off of him. They took Cruce off of the engine at Jefferson Springs and put him on a caboose, and brought him to Little Rock to the hospital. When witness got to Little Rock, he reported the rack on the engine as in bad condition. After lifting the tool-box off of Cruce witness saw one of the fingers was bent on the rack. Wit-

ness was familiar with the duties of a fireman on freight trains. When witness got on his engine, he had occasion to get the monkey-wrench out of the tool-box, and, in attempting to lift the box out of the rack, found that he could not move the tool-box with his hands. The rack has a bar of iron something like 3/8 of an inch in thickness and 2½ or 3 inches wide, and there are strips running across and riveted to a sheet on the face of the tank. It has fingers that turn up. The tool-box is made of sheet iron about 15" or 16" long and 4½" or 5" wide. The tool-box sits in the rack. The prongs stood up at each end about three inches high, and the strips of iron forming the rack turn up and make what they call the fingers of the rack. The strips of iron stick up in front of the box about two or three inches high. The box is held at the back by the sheet iron of the tank. The two strips were riveted to the tank, and then turned straight out the width of the box and then turned up three inches. The prongs or fingers, two in front and one on each end, held the box in the rack. The left prong or finger on the rack was bent out to an angle of about 45 degrees, and that left one prong straight up on the front. The one front prong and the prong on each end would keep the box from falling out. Witness didn't see how the bent prong had anything to do with the box falling out. The rack was bolted to the top sheet that makes a part of the front part of the coal tender. There is a space in the tank where the coal stays that is surrounded by the tank that holds the water. The bottom of the tool rack is about four and a-half feet from the floor. The box itself was four or four and a-half feet high. From the door of the firebox to the gates that hold the coal in the tank running through the center of the engine is something like 7½ feet. The coal gates were right under where the tool-box hung. When the fireman stoops down to take up a scoop of coal, he stoops under the tool-box. It is something like 4½ feet from the place where he takes his coal to the box. The bent prong of the tool-rack would be in plain view of him when he turned each time to get the

coal. Witness had never noticed the bent prong until he picked the tool-box off of Cruce. The witness looks forward more than the fireman to see where the engine is running. The box is a portion of the tank equipment. The fireman has charge of the coal of the engine, and loads it. He also takes the water. In order to get over the water tank the fireman goes over the tank wall by the box or around it. It is usual for him to go straight over. The fireman had a better opportunity than witness to observe and inspect the condition of the box, as he worked under it and around it. It was the duty of the fireman to keep a lookout.

The plaintiff, Cruce, testified, in addition to his testimony already set out, that he had been working as a fireman on the Missouri Pacific nearly three years when the injury occurred. He was injured near Jefferson Springs by the tool-box falling out of the rack on to his back. The rack was fastened on the top of the cab just over the coal gates. It was 5½ or 6 feet over the top deck. One as tall as witness would have to climb over the coal gate to get tools out of the box, if it was necessary for him to get them. The company had a man at the end of the terminal at the roundhouse to put the tool-box in the rack for the engineer's use. Witness had nothing to do with that. Witness was in a stooping position, putting in the coal. He had reached back for the second or third scoop, and, as he was in the act of opening the firebox, the tool-box fell out of the rack and hit him between the shoulders, in the small of the back. The tool-box would weigh between fifty and seventy pounds. Witness had not noticed the tool-box when he got on the engine, further than looking up to see if the coal gate, the shaker bar, and clinker lever, were in proper place. Witness noticed that the box was in the rack just by glancing at it. He saw nothing wrong about it. When the box fell on witness, it knocked him down. He remembered the engineer stopping the engine and whistling for the crew to come. About the last witness remembered was when they were taking him off of the engine. Some people had got up

there about that time, and witness heard them ask the engineer, Read, if witness was dead or killed. Witness heard a lady's voice ask Mr. Read if witness was killed. He said he didn't know. She asked what happened, and he said the tool-box fell on witness. She asked him how come it to fall, and he said the rack was bent; that was the last witness remembered. Witness then described the nature and effect of his injury, which testimony it is unnecessary to set forth.

Witness further described the tool-box and the tools it contained, and stated that when the box fell the lid came open and the tools scattered all around witness on the deck. Witness was conscious about five minutes from the time he got hurt until they took him off the engine. The engine should have been inspected at McGehee or Little Rock. They are inspected at each of the terminals and at the roundhouse. The company had two or three shifts of inspectors at McGehee and Little Rock. Cook was the inspector at McGehee. He got off duty soon after witness arrived there—about 3:30 in the morning. He would not have had time to inspect. There are three hours that they have no inspectors. The inspector is supposed to be relieved at 4 o'clock in the morning, and thereafter there is no inspector until 7 o'clock in the morning. The engine witness was on could not have been inspected that morning. There was no inspector there. He was still on duty when witness got there, but would not have had time to inspect the engine, because it takes an hour or an hour and a-half to do that. The engine was turned over to the hostler in the yards, whose duty it is to put them in the round-house and bring them from the roundhouse and connect them with the trains. On that morning they stayed there about three hours, doing what was called 'doubling the route.' They seldom did that. This was the second time witness doubled on that road in about three years. Witness had no instructions from the engineer about inspecting the tool-box and tools. When witness glanced at the tool-box, he saw nothing wrong—

nothing out of the ordinary. Witness was supposed to
see that the tools he used in firing were on there—his
shovel, coal pick, clinker bar and shaker. These do not
go in the tool-box. When these tools are not on the
engine, he notifies the engineer, and the engineer calls
the hostler to have the supply man put them on. Wit-
ness didn't use any of the tools in the tool-box. If
there was anything wrong, witness didn't observe it.
Witness was asked what caused the box to fall out of
the rack, and answered, ''The prong being out of shape,
and probably the box was too small.'' Witness supposed
the rack was in bad order. It could have been both this
and the box being too small. As witness climbed up
on the engine and noticed the box up in the rack, it was
three or four or five feet from witness. Witness
saw the box up in the rack when he left Little Rock. He
didn't have any light in the cab on the engine going down
to McGehee, except the water glass light. They were
supposed to have a light over the coal gates to reflect
down on the deck, but witness didn't remember whether
it was up there on that particular night or not. They
arrived at McGehee at 3:30 and left at 6:45. It was
daylight when witness got on the engine and looked at
the box. Witness didn't see that it was put correctly
in the rack—didn't pay any particular attention. It was
not in witness' line of duty, but he always looked to see
if everything was in the proper place. Witness doesn't
have to inspect the engine unless directed to do so by
the engineer. Firing is the most that witness had to
do. If inspection and cleaning are assigned to witness,
he is supposed to do it. Witness was under the engi-
neer's jurisdiction. It was the duty of witness, as fire-
man, to inspect everything about the tank that came
under his observation, but it was not his place to inspect,
because witness didn't have any time for that. His
duty was to run the engine from his seat and get down
and oil it around under the cab. Witness' duties kept him
turning towards the tank and back most of the time to
get the coal. Witness was asked: ''Every time you

turn back to get coal, it put this tool-box in your line of vision, didn't it? A. No sir; if you did, you would have to look up every time. You always look down when you go to get a scoop full of coal." Witness was asked, "When you go back to get water, you would go back past the tool-box, wouldn't you, every time? A. I didn't go over it. I got down to the side of it. I either dropped off—generally, I dropped off on the ground. * * * I dropped off on the ground, and would catch the rear of the tank and go up on the ladder." Witness then described to the jury the position he was in and the movements he had to make when he was putting coal in the firebox. He states, "When I swung back to get the coal, I would swing back under it, stooping, and, with the engine running as fast as we were, I judge it would be 4½ feet high." After describing the position witness would be in in putting the coal in the firebox, he was again asked how high the box was, and answered, "Five feet;" that it was up over witness' head, probably 5½ or 6 feet. The coal was back 7½ feet from the fire-box. When witness straightened up to get on the fireman's seat, he would be about four or five feet from the box. Witness was asked if any one on the train connected with the train crew up to the time this box fell was in a better position than witness to tell the condition of the box, and answered, "I think so. I think any member of the crew would have been, for the simple reason that the fireman is the only one that works. Every time the engine whistles at a bunch of cattle or a crossing, the fireman has to go to firing." The fireman could tell if there was any defect in the tool rack if he saw it, but he had no reason to see it. He didn't get any of the tools. The engineer didn't tell witness to get any of the tools. Witness stated that the tool-box fell because it was in bad order; that it would not have fallen if it had been in proper condition. If the rack had been in good order, the box would not have fallen out, unless the engine had turned over or hit some rough track. It might have been possible to have thrown it out, but witness didn't think it would have fallen if

the rack had been in proper condition. Witness didn't remember whether they hit any rough track.

A witness by the name of Pump testified that it was his duty to make tool-boxes and racks to hold them on the engine. He described the manner in which the rack was made and attached, substantially the same as already set forth in the testimony of the engineer. The tool-boxes were 30 inches long and 8 inches square. The box with its equipment of tools would weigh between 50 and 55 pounds. The prongs or fingers come up straight to hold the box in. Witness was asked what effect it would have on the box as to making it safe if one of the prongs or fingers is bent out at an angle of 45 degrees, and answered, "I don't know much about that—how it would be affected at all. It would jump out if it was bent. The purpose of putting the prongs there at all is to hold the box in." On cross-examination witness was asked, "If there were just one of those prongs in front, the box would have sufficient prongs to hold it in there, wouldn't it?" and answered, "No, it would slip out on just one." He further stated that with one of the front prongs bent and another front prong three inches high holding and one at each end holding, the box would jump out easy, according to witness' idea.

Another witness testified for the plaintiff to the effect that he was working for the defendant company at McGehee in June, 1922, as inspector. He went on at eight P. M. and off at 4 A. M. The next inspector came on at 7 A. M. Witness didn't inspect the engine on which Cruce was injured. It came in at 3:45 in the morning. It is the duty of the inspector to inspect the engine all around for defects in any of the running equipment or safety appliances. It was a part of witness' duty to inspect the tool-box, tool-rack, etc.

A rule of the company was introduced which specified, among other things, that firemen must "assist in the inspection and cleaning of the engine on the road and do the cleaning assigned to them."

At the conclusion of the testimony the court instructed the jury to return a verdict in favor of the defendant company, which was done. Judgment was rendered in favor of the defendant, from which is this appeal.

In *Jones* v. *Lewis,* 89 Ark. 372, it is said: "In determining on appeal the correctness of the trial court's action in directing a verdict for either party, the rule is to take that view of the evidence that is most favorable to the party against whom the verdict is directed, and, where there is any evidence tending to establish an issue in favor of the party against whom the verdict is directed, it is error to take the case from the jury." *Williams* v. *St. Louis-San Francisco Ry. Co.,* 103 Ark. 401, and many cited in the above.

Under the above rule, we are convinced that reasonable minds, giving the evidence its strongest probative force in favor of the appellant, might reach a different conclusion from that reached by the trial judge. There was testimony to warrant a jury in finding that the company was negligent in not exercising ordinary care to have the tool-rack properly inspected and repaired; that the tool-rack was in a defective condition, and that such defect was the proximate cause of the injury to appellant; that appellant did not know and appreciate the danger of the defective condition of the tool-rack; that the defect was not so obvious that appellant was bound, in the exercise of ordinary care for his own protection in the discharge of his duties, to have discovered the same; that the danger from the defective rack was not one of the ordinary risks incident to appellant's employment.

These were issues of fact under the testimony on which reasonable minds might reach different conclusions. The court therefore erred in not submitting these issues to the jury under appropriate instructions. For the error in directing the verdict the judgment is reversed, and the cause is remanded for a new trial.