ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY *v.* HALL.

Opinion delivered October 20, 1930.

E. T. Miller, E. L. Westbrooke, Jr., and E. L. Westbrooke, for appellant.

Harrison, Smith & Taylor and C. T. Carpenter, for appellee.

BUTLER, J.   The appellee, G. A. Hall, had for many years operated stations for pumping water for engines of the appellant company.   For about a month preceding October 12, 1927, he was engaged in this business for the appellant at Monette, Arkansas.   The engine which he operated at this place was a coal oil burner, and the fuel was delivered by the section crew at the pump house and by them carried within and placed in proper position. On the morning of the 12th of October, 1927, the section crew, composed of the foreman and four men, loaded a push cart at the depot with a case of cup grease, a thirty-gallon drum of gasoline and a one hundred and ten-gallon drum of coal oil, and pushed the car by means of the motor car used by the section crew to a point opposite the pump house, variously estimated at being from six to nine feet from the door of said pump house.   It was the purpose of the section crew to there unload and place the grease, gasoline and coal oil in the pump house for the use of the operator Hall.   In the course of unloading Hall's leg was broken by the drum of coal oil rolling against it, catching it between the drum and the door sill of the pump house.   Hall was carried to a hospital in Jonesboro where he remained for about twelve days when he was transported to one of the company's hospitals at Springfield, Missouri, at which he remained until December 20, 1927.   For some days before that date he had recovered sufficiently to go about the hospital on crutches, and he was informed by the physician in charge that he might go home for the Christmas holidays.   He left the hospital on December 20, and reached his son's home near Leachville on the morning following.

On December 22, 1927, Mr. Allard, the claim agent of the appellant company, visited Hall ffor the purpose of effecting a settlement for the injury sustained by Hall. He found Hall in bed, complaining of being exhausted by the journey from the hospital at Springfield and feeling very unwell. Allard did not press the question of settlement, but left. Some three or four days afterward Hall visited his wife's brother-in-law, John Dunham, at Holcomb, Missouri, and remained there for three or four days. He left in company with his son-in-law, N. D. Oxley, for the latter's home at St. Francis, Arkansas, at which place he was on the 9th of January, 1928. On that date, the claim agent again visited Hall, and a settlement was agreed upon for the sum of $750, and Hall signed a written instrument which by its terms in consideration of the said $750 released the appellant company from all liability and from all claims for the injury which occurred in the preceding October, including those that then existed or which might thereafter develop. Upon the execution of the release Allard delivered to Hall the company's check for $750 which Hall retained until January 18, 1928, when he deposited the same to his credit in a bank at Blytheville, Arkansas, immediately drawing out $250 in cash. After leaving the bank it was Hall's purpose to consult with his physician regarding the condition of his leg, and, while going along the street, one of his crutches slipped causing him to fall breaking his leg again. He was given first aid and immediately taken to the company's hospital at St. Louis, Missouri, where his leg was reset and treated for a time until he could again go about the building on crutches. His leg did not heal properly and was then placed in a plaster cast, and in this condition he returned to his home with instructions to return to the hospital at the end of forty days. In about forty-six days he did return, and after further examination it was determined that it would be necessary to amputate his leg, which operation was performed on July 12, 1928.

In the month of August, 1928, he checked on the remainder of his deposit in the Bank of Blytheville for two small amounts. He drew two checks in September, four in October, one in December, four in January, 1929, and one in February, 1929, when there was left in the bank of the $750 received from the appellant company the sum of $120. On the 25th day of April, 1929, Hall filed suit against the appellant company for damages for the injury sustained on October 12, 1927, alleging that his injury was occasioned by reason of the negligence of the appellant's employees. The appellant company answered denying negligence, and pleading as a further defense the settlement entered into January 9, 1928. To the plea of settlement the appellee replied alleging that the settlement was induced by fraud and entered into by reason of a mutual mistake, and that the same was not valid and binding. The case was presented to the jury on these issues, and from a verdict and judgment adverse to the appellant is this appeal. Such further facts as are necessary for an understanding of the issues and conclusions reached will be hereinafter stated.

The three major propositions presented here, as in the court below, and urged as grounds for reversal are, first, that the evidence failed to show any negligence on the part of the appellant's employees; second, that the release signed was fairly entered into without misrepresentation or fraud or because of mutual mistake and is valid and binding; and third, that the appellee by his act accepted the benefits of the settlement and ratified the same.

1. The testimony regarding the happening of the injury to Hall is in hopeless conflict, but, for the purpose of testing its sufficiency, the testimony of the appellee must be accepted and viewed in its most favorable light and given its strongest probative value. All of the testimony for the appellee was given by himself alone, which was to the effect that, as the push cart with its load approached down the railroad track and stopped at a

point opposite the front door of the pump house, he entered the pump house for the purpose of stopping the engine and removing the belt; that it was necessary to do this in order that the coal oil drum might be rolled beyond the engine and placed upon a shelf elevated at some distance from the floor; that immediately after stopping the engine he turned facing the door and started in that direction, the section crew at that time being immediately in front of the pump house having already unloaded the case of cup grease and the smaller drum containing gasoline; that at this time the appellee and the section crew were in full view of each other. Preparing to come out of the pump house, appellee made a step so that one foot and leg were beyond the door sill, at which time the large drum weighing 950 pounds was rolled by the section crew from the push cart catching appellee's leg between the door sill and the drum, causing the injury. Appellee stated that his purpose for leaving the pump house at this time was to assist the section crew in unloading the drum of oil and placing it in the pump house; that he was sixty-five years old and had been operating pump stations for the appellant company for a number of years, and that the manner in which the oil was unloaded was customary; that this was the first time since he had been at Monette that it was necessary to deliver any oil to his station. Appellee also stated that "skids" were used in unloading push carts, but that they had no skids on this occasion.

The evidence is undisputed that it was the duty of the section crew to unload the coal oil and other articles, and, after having unloaded them, to bestow them in the proper place within the pump house, and that none of this was a part of the duty of appellee. Appellee insists that upon this state of facts a case was made for the submission of the question of negligence of appellant's servants to the jury and in support of this contention has cited a number of cases, among which is that of *Cruce v. Missouri Pac. Ry. Co.*, 167 Ark. 88, 266 S. W. 981, where

the negligence alleged was the failure to furnish a safe place in which to work in that the appliance for holding up a tool box near the place where plaintiff worked was defective causing the tool box to fall, injuring the plaintiff.

In *Pollock* v. *Hamm*, 177 Ark. 348, 6 S. W. (2d) 541, the plaintiff was alleged to have been injured by the negligent operation of a motor truck. In *Beal-Doyle Dry Goods Co.* v. *Carr*, 85 Ark. 479, 108 S. W. 1053, 14 Ann. Cas. 48, cited as a case directly in point, the negligence was alleged to be the leaving open of the door of an elevator to which plaintiff had been directed for ascent to a higher floor in the building, and through which he stepped falling and injuring himself. These cases are entirely dissimilar to the instant case and can have no application to the issue here involved. The case most nearly in point cited by the appellee is that of *St. Louis etc., Ry. Co.* v. *Burdg,* 93 Ark. 88, 124 S. W. 230. In that case the court said: "The evidence on the part of the plaintiff tended to prove that the end of the box car had been knocked out, and that the plaintiff and his fellow-servant were engaged in removing the brake rod. This rod was encased in the brake plate at the top of the car, and this plate was fastened to the car with screws; and when the plate was entirely loosened, it would slide down the rod. The employee on top of the car had loosened the plate from the car by removing the screws, and was holding the plate against the side of the car while the plaintiff on the ground took hold of the lower end of the brake rod and was raising it out of the socket. The employee on the top of the car let the iron plate drop or slide down on the plaintiff while he was thus raising the rod. He gave no warning of letting the plate drop, and at the time the plaintiff was looking down while engaged in the duty of raising the rod and did not see the plate as it fell. From the facts and circumstances detailed we are of the opinion that the evidence is sufficient to sustain a finding that the fellow-servant was negligent in permitting or causing the brake plate to fall upon the plaintiff; and

482

that at the time the plaintiff was in the exercise of due care.'' That case is readily distinguishable from the case at bar. There, the two servants were engaged in a common enterprise which needed the combined efforts of both to accomplish, and the nature of the duty to be performed by the person who was injured necessarily required him to look downward at the work he was doing and from his position below the other workman and the direction in which he was obliged to look prevented him from observing the conduct of his fellow-servant who on his part could plainly see the position of the other, and, seeing this, dropped the brake plate over the top upon his fellow-servant without any warning being given. Here, the facts are entirely different. Hall was not engaged in a common enterprise with the section crew, and was in a position where he could observe all they were doing and while they could also see him, they were more directly concerned with the unloading of the coal oil and had no occasion to scrutinize Hall's position with any great degree of attention. They were engaged in a simple operation requiring no skill or extraordinary care and while skids were sometimes used, it was not the invariable custom nor was it necessary on this occasion. Hall had entered the pump house when they were preparing to unload the push cart without telling them what his purpose was and there was no reason for them to anticipate that he would leave the pump house, nor was there any occasion for him to do so. Therefore, there was no reason for the section crew to warn Hall of their intention to roll the coal oil drum off the cart; nor was there an opportunity for doing so as the act of pushing the oil off the cart and that of Hall in stepping from the pump house appear to have been simultaneous. We are unable to see any conduct on the part of the section crew different from that of ordinarily prudent men engaged in similar work under the same circumstances. As before stated, the section crew was engaged in doing a simple piece of work such as is done continually, and one which

would require no more than ordinary foresight and prudence. As has been aptly said: "A reasonable man can be guided only by reasonable estimate of probability. If men were bound to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all." *Anderson* v. *Forrester-Nace Box Co.,* 103 Mo. Appeals 382, l. c. 387, 77 S. W. 486.

2. The appellee contends that he was induced to sign the release under the mistaken belief that his leg would soon get well, and that this belief was induced by the statements of Dr. Cecil and the claim agent, and that this mistaken belief continued until he consulted with a physician who expressed surprise at his being out of the hospital, and when speaking of the condition of appellee's leg, said: "You haven't got any leg." This statement alarmed appellee especially because his leg had begun to swell and to hurt more and more severely. The appellee stated this interview with the physician occurred three or four days after the settlement of January 9 so that from that time on he was no longer deceived as to his condition, and with this knowledge retained the appellant company's check several days longer before depositing it, drawing $250 in cash and placing $500 to his credit in the bank at Blytheville, this being done before the time of his second injury on the same day he made the deposit. Assuming that the release had been procured as alleged by the appellee, his taking advantage of the settlement by depositing the check to his credit was a ratification of such release, for if he had been deceived he learned the truth and it was then his duty to disaffirm the contract as quickly as reasonable diligence would allow, and, having failed to do so and deriving all possible benefit from the transaction, he cannot now be relieved as by his conduct he has waived all benefit of, and relief from, the misrepresentations. *Wilson* v. *Strayhorn,* 26 Ark. 28; *Lamden* v. *St. L. S. W. Ry. Co.,* 115 Ark. 238, 170 S. W. 1001; *McCormack* v. *Daggett,*

162 Ark. 16, pgs. 22 and 23, 257 S. W. 358, and cases therein cited.

Having reached the conclusions as above stated, it follows that the judgment must be reversed, and the case dismissed. It is so ordered.

Mr. Justice HUMPHREYS concurs on the ground that appellee ratified the release.