MINTON v. HALL.

4-9318                                                      234 S. W. 2d 515

Opinion delivered December 4, 1950.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Roy S. Dunn* and *Chas. X. Williams,* for appellee.

HOLT, J.   Appellees, Mrs. Eli Hall and Mrs. Verna Lee Bennett, sustained personal injuries March 28, 1949,

when the automobile in which they were riding, collided with a car driven by appellant, Dr. Minton. About three days after the collision, a claim adjuster, acting for appellant's liability insurance carrier, after determining that appellant was legally liable for the damages (which is now conceded by appellant) effected a settlement with Mrs. Hall and her husband for $300 and on April 14th, made a settlement with Mrs. Bennett and her husband for $500.

September 23, 1949, Mr. and Mrs. Hall and Mr. and Mrs. Bennett, filed the present suit against Dr. Minton seeking damages. Appellant pleaded, as a complete defense, the above settlements and releases procured from appellees. Mrs. Hall, in reply, alleged that she had never signed or authorized anyone to sign any release. Mr. Hall and Mr. and Mrs. Bennett replied that they were induced to sign the releases through fraud and misrepresentations.

A jury trial resulted in awards, in addition to the above settlements, of $500 to Mrs. Hall, $1,100 to Mrs. Bennett and $150 to Mr. Bennett.

This appeal followed.

Appellant says that "on this appeal the appellant relies only upon the failure of the court to direct or instruct verdicts in his favor."

He argues that (1) "the releases were valid and binding," and (2) "the releases and settlements had been ratified by the plaintiffs."

The evidence appears to be practically undisputed that Mrs. Eli Hall never signed any release or authorized anyone to sign a release for her. She testified: "Q. Do you remember someone talking to you about signing some instrument of writing? A. Yes, trying to get me to sign but I said, 'I'm not signing anything.' Q. Did you sign anything? A. No, sir, I sure didn't. Q. Did you authorize anyone to sign your name? A. No, sir, I sure didn't. Q. You sure didn't? A. I know that I didn't. Q. Why wouldn't you sign? A. Because I didn't

know how long I was going to be there (hospital) and I wanted to wait and see how I got along first. * * * Q. Mrs. Hall, you understand that your name is on a release now? A. I don't know, I've never seen my name on anything. Q. Has anybody told you that they signed your name on the release? A. Yes, my daughter told me that she did. Q. Now, when did you find that she had put your name on a release? A. I don't know whether it was after I came out of the hospital or while I was in the hospital. * * * Q. Did your husband ever tell you that he had signed the release? A. Yes, he told me that he had signed it and wanted me to sign it, and I said, 'I won't do it.' And I didn't. * * * Q. Did Mr. Barton want you to sign? A. Yes, sir, and I said I would not do it, and I didn't. Q. You told them you wouldn't? A. Yes, sir. Q. Did you know that Mrs. Bradshaw was signing your name on the release? A. No, sir.''

Mrs. Bradshaw (Mrs. Hall's daughter) testified: ''Q. Did your mother ever sign that release? A. No, sir, she didn't. Q. Who did sign it? A. I signed it. Q. At whose request did you sign that? A. Well, Mr. Barton told me to go ahead and sign it. He said, 'your dad has already signed it and it won't make any difference, you go ahead and sign it.' ''

The above testimony was sufficient to warrant the finding by the jury that the release did not bind Mrs. Hall.

Unless, thereafter, Mrs. Hall subsequently ratified the release in question, she would not be bound by it. As to ratification, Mrs. Hall testified: ''Q. Mrs. Hall, this is a $300 check marked Exhibit 'B'. It has your name on the back of it. A. Well, I'll tell you before I even look at it that I didn't sign it. I don't care if somebody has signed it, I sure didn't. * * * A. No, I don't know who put my name on the check, but I know that I didn't. Q. Do you know what happened or who took care of the check after you all got it? A. No, I don't. I never did see the check.''

It appears that the draft with Mrs. Hall's name endorsed thereon, by some unauthorized person, was de-

livered to the hospital (to which Mrs. Hall had been taken, following her injuries) was in payment of Mrs. Hall's hospital bill of $85 and the remainder of $215 delivered to Mrs. Hall. She testified: "Q. I believe that you stated that some lady brought the money up and told you to give it to your husband. This was while he was gone for lunch, is that correct? A. Yes, sir. Q. Really, you didn't know what the money was for, did you? A. No, sir, I didn't. Q. You knew it wasn't for any settlement of yours because you hadn't signed anything, had you? A. That is right. Q. You knew that you hadn't made any settlement, didn't you? A. Yes, sir, I never did sign for anything."

The draft in question was made payable to Mrs. Hall, her husband, Eli Hall, and the hospital. Mrs. Dana Matthews (an employee and bookkeeper at the hospital) testified that she cashed the $300 draft for the hospital, and after deducting its bill for $85, gave the balance of $215 to Mrs. Hall for her husband, Eli Hall. She testified: "Q. Why did you give the money to Mrs. Hall? Why didn't you give it to Mr. Hall? A. Mr. Hall wasn't present. Q. If Mr. Hall had been present, you would have given the money to him? A. Yes, sir. * * * Q. Who gave you this check that you testified about taking and holding. A. I think that it was Mr. Hall. Q. Mrs. Hall as far as you know hasn't had anything to do with this check, has she? A. No, sir. * * * Q. She never had discussed it? A. No, sir. * * *"

Mr. Hall testified that when he signed the release and draft that he understood from appellant's adjuster that he was settling his own interest and not that of Mrs. Hall, his wife. We hold that the above testimony, when viewed in the light most favorable to Mrs. Hall, was substantial and warranted a finding by the jury that, in the circumstances, Mrs. Hall had not ratified the release and was, therefore, entitled to recover. (*Missouri Pacific Railroad Company, Thompson, Trustee*, v. *Lewis*, 211 Ark. 71, 199 S. W. 2d 325.)

The court, therefore, did not err in denying appellant's request for an instructed verdict in his favor, in the circumstances.

"The trial court is not authorized to take the case from the jury in the first instance, if there is some substantial evidence to support a verdict against the party making the request or in favor of whom it is directed. In determining the question here, we view the evidence in the light most favorable to the complaining party." *Harper* v. *Bankers' Reserve Life Insurance Company*, 185 Ark. 1082, 51 S. W. 2d 526.

As to the verdicts and judgments in favor of Mr. and Mrs. Bennett, we have reached the conclusion that there is no substantial evidence presented to support either. They claim, in effect,—and the jury found,— that they were induced to execute the release by false representations made by the claim adjuster to them, and that he took the release with him without giving them any opportunity to see that it was a general release rather than a limited one, as they claim. We find it unnecessary to consider such contention of appellees about the release because the evidence shows, without contradiction, that the claim adjuster left with the Bennetts a check or draft with the following writing plainly written on the face thereon: "Pay to Order of Verna Bennett, Hugh Bennett and Dr. Rogers Hederick—$500, Five Hundred and No/100 Dollars, in full settlement of the following account or claim arising out of an accident near Blue Mountain, Arkansas, 3-28-49, etc.," and on the back of the draft: "This draft constitutes settlement in full of the claim or account described on the face hereof and the payees by endorsement below accept(s) it as such.— Roger Hederick, Hugh Bennett, Verna Bennett."

Mr. Bennett was 63 years of age and his wife 47. Both could read and write. After the draft had been delivered to the Bennetts by the claim adjuster (Mr. Barton), Bennett testified: "My wife and I didn't look at the check until Mr. Barton left. We never paid any attention to it until Mr. Barton had gone." Following Mr. Barton's departure, the Bennetts testified, in effect,

that they examined the draft and noted Dr. Hederick's name was included as a payee. They then obtained Dr. Hederick's endorsement and after endorsing it themselves, took the draft to the bank, cashed it and kept the proceeds of $500. Such act on their part amounted to a general release and a ratification. What was said in the case of *St. Louis-San Francisco Railway Company* v. *Hall,* 182 Ark. 476, 32 S. W. 2d 440, applies here. It was there held: (Headnote 3) "Where plaintiff took advantage of a settlement paid for release from liability. after knowledge of alleged misrepresentations, he will be held to have ratified the settlement," and in the body of the opinion, we said: "Assuming that the release had been procured as alleged by the appellee, his taking advantage of the settlement by depositing the check to his credit was a ratification of such release, for if he had been deceived he learned the truth and it was then his duty to disaffirm the contract as quickly as reasonable diligence would allow, and, having failed to do so and deriving all possible benefit from the transaction, he cannot now be relieved as by his conduct he has waived all benefit of, and relief from, the misrepresentations. *Wilson* v. *Strayhorn,* 26 Ark. 28; *Lamden* v. *St. L. S. W. Ry. Co.,* 115 Ark. 238, 170 S. W. 1001; *McCormick* v. *Daggett,* 162 Ark. 16, pgs. 22 and 23, 257 S. W. 358, and cases therein cited."

Accordingly, the judgment in favor of Mrs. Hall is affirmed, together with all her costs. The judgments in favor of Mr. and Mrs. Bennett are reversed and both causes dismissed, appellant to recover his costs in the Bennett cases.