EASTBURN *v*. GALYEN.

5-1155                                    300 S. W. 2d 10

Opinion delivered March 11, 1957.

[Rehearing denied April 15, 1957.]

*George E. Steel, Wootton, Land & Matthews, Rose, Meek, House, Barron & Nash* and *John H. Haley,* for appellant.

*Nabors Shaw,* for appellee.

PAUL WARD, Associate Justice. For some years prior to March 9, 1955, appellees, L. A. Galyen and his wife, owned a cheese plant at Mena, Arkansas, known as Seven Valley Cheese Plant. A brother of L. A. Galyen, Lindsey Galyen, actively managed the plant for appellees.

On March 9, 1955, appellant, John M. Eastburn, entered into an agreement to purchase said plant for the price of $45,000, of which $10,000 was to be paid upon completion of the agreement and the balance of $35,000 was to be paid in monthly installments of $500 plus accumulated interest—the first payment to be due May 1, 1955. The sale was consummated on or about March 26, 1955, through an escrow agent, a deed and bill of sale executed by appellees and a note and mortgage executed by appellants being delivered to the escrow agent. It appears from the record that the $10,000 was paid to appellees and that the deed and bill of sale were delivered to appellants, and the note and mortgage delivered to appellees within 30 days after March 26, 1955. At the time the sales agreement was entered into John M. Eastburn took possession of the cheese plant and began operating it, and continued to operate it until the decree appealed from was rendered on May 25, 1956.

Appellants having failed to make any of the $500 monthly payments (with interest) heretofore mentioned, appellees filed, on October 5, 1955, a foreclosure suit in the chancery court, asking for judgment for the full amount of the note and, if necessary, for a sale of the mortgaged property.

After filing a demurrer and several motions appellants filed an answer on April 17, 1956, in which they sought a rescission of the purchase agreement on the ground that they had been induced to purchase the plant by the fraudulent misrepresentations of L. A. Galyen and

his agents. The specific allegations on fraud are substantially the following: (a) Lindsey Galyen employed one Earl Goodner to serve as the agent of appellees to assist him (Lindsey) in practicing a fraud upon appellants, and said Earl Goodner represented himself to be a friend of appellants and to be personally interested in their welfare, and that he (Eastburn) relied upon Goodner's superior knowledge of the cheese business; (b) Appellees' agents represented that the value of the cheese plant was in excess of $50,000 when it was known to them to be of the value of not more than $15,000, and; (c) the plaintiffs and their agents "fraudulently misrepresented the true quantity and quality and value of the stock of merchandise on hand at the time these defendants assumed control of said plant." Appellants, in a cross complaint, asked judgment against appellees for the value of some cheese which appellees had sold for them. The trial court gave appellants judgment for $1,252.50 from which there has been no appeal.

A great deal of testimony was presented by both sides tending to show and refute fraudulent misrepresentations alleged to have been made by appellees and their agents, after which the chancellor, without making any specific findings of fact, rendered judgment in favor of appellees in the amount prayed for, after giving credit to appellants in the amount of $1,252.50, and ordered a sale of the mortgaged property if said judgment was not paid within the time specified by the court.

After a study of the entire record, and after weighing the able arguments presented by both sides, we have reached the conclusion that appellants, by their actions hereinafter set forth, waived any right they may have had at one time to rescind the purchase agreement because of fraudulent misrepresentations. In accordance with this disposition of the case it will not be necessary for us to discuss the testimony in detail, or to determine whether or not said misrepresentations of facts were made by appellees or their agents, or to evaluate several propositions of law which are discussed at some length.

The substance of Mr. Eastburn's testimony relative to misrepresentations of facts, fraudulent or otherwise, which induced him to purchase the cheese plant, is the following:

(a) He stated that if he had known a hoop of cheese was worth only $24.50 instead of $35 as was represented to him, and if he had known that cream was bringing only 60 cents a pound instead of 78 cents as was represented to him he would not have bought the plant.

(b) If he had known that Mr. Goodner was acting as an agent for appellees he would not have considered buying the plant.

(c) He stated that appellees told him they could manufacture 94 hoops of cheese in 10 days but that he could manufacture only 64 hoops in 10 days; and that when he bought the plant he was told there was 108 hoops of cheese when in fact there were only 94.

The evidence shows very clearly, and certainly the trial judge was justified in finding, that appellants knew about the above alleged falsifications within a few days or a few weeks at most after they went into possession of the cheese plant. According to Eastburn's own testimony he found out within 10 or 12 days after taking charge of the plant that cheese was selling for only $24.50 per hoop and that cream was selling for only 60 cents a pound. Within the same period of time he learned that there were only 94 hoops of cheese conveyed to him instead of 108, and he also learned how much a hoop of cheese weighed. By Eastburn's own testimony it appears that he was not dissatisfied at all with the amount of cheese the plant would produce. He was asked this question: "You were well pleased with what the plant would produce?" Eastburn's answer to this question was: "Oh, yes." As to the weight of a hoop of cheese Eastburn gave this testimony: Q. "But you had the hoops of cheese?" A. "Yes, I weighed some of the hoops they were not weighing 100 pounds." Eastburn further testified:

Q. "When did you first discover that a can of cream wouldn't bring $35?"

A. "When we shipped the first time."

Q. "When was that?"

A. "I haven't these dates."

Q. "How many days after March 9?"

A. "Well, let's see. I believe they picked up every week so it would be within ten days."

Q. "What did you discover then?"

A. "Well, we were very much disappointed in our weights and in our prices, and we thought there must have been some mistake."

Q. "All right. Did you go right then and act promptly and offer to turn this business back to the sellers?"

A. "No."

Q. "You didn't say a thing to them about it?"

A. "It is kind of hard for me to accuse anybody."

As to Eastburn's knowledge of the actual number of hoops of cheese, he testified:

Q. "When did you first discover that there were some hoops of cheese short?"

A. "I think it was twelve."

Q. "When did you discover that?"

A. "That was the first load, including the inventory and the few hoops we had made."

Q. "Was that a few days after you bought the place?"

A. "Yes."

If Mr. Eastburn was deceived by Earl Goodner acting as appellees' agent without his knowledge, he found out the true situation by about May 1, 1955. This fact is shown in this way: Goodner sued appellees for a $1,000 commis-

sion fee, and garnisheed the escrow agent for that amount. This matter was settled about May 1, 1955, and Eastburn testified that he learned of Goodner's agency relationship to appellees at that time.

Therefore it appears that on or before the first of May, 1955, Mr. Eastburn had learned the true situation regarding all matters about which he claims to have been deceived, yet he had made no complaint whatever about any of these before the foreclosure suit was filed on October 5, 1955. Not only did appellants make no complaint to appellees, but they continued to operate the cheese plant all along, even up to the day of the foreclosure decree on May 25, 1956. While so operating the cheese plant Mr. Eastburn had many contacts with L. A. Galyen (one of the appellees) who also assisted him on numerous occasions in the operation of the plant, and in buying new equipment for the plant.

As before stated, it is not necessary for us to decide whether any material misrepresentations were made to Mr. Eastburn or whether, if made, he relied on them. We do hold however that, if Mr. Eastburn was deceived by any such false misrepresentations, he waived any right he might have had to rely on them for a cancellation of the sales contract by failing to make a complaint promptly or within a reasonable time after learning of the alleged deception. This court has frequently and clearly announced the rule applicable to a situation such as presented in this case. See: *Fleming* v. *Harris,* 142 Ark. 553, 219 S. W. 33; *McCormick* v. *Daggett,* 162 Ark. 16, 257 S. W. 358; *Pylant* v. *Braden,* 166 Ark. 377, 266 S. W. 272; *St. Louis-San Francisco Railway Company* v. *Hall,* 182 Ark. 476, 32 S. W. 2d 440, and; *Minton* v. *Hall,* 218 Ark. 92, 234 S. W. 2d 515.

The original note and mortgage sued on by appellees were lost, and appellants make the contention that Eastburn's wife did not sign and that the mortgage did not contain a waiver of the right of redemption. We have carefully examined the record in this connection and are convinced that the Chancellor's findings contrary to ap-

pellants' contentions are not against the weight of the evidence. The undisputed evidence is that the mortgage was of standard Arkansas form. As we interpret Mr. Eastburn's testimony he admits that his wife did sign.

> Q. "Yes, sir, you may answer my question. You and your wife don't deny executing that mortgage and note?"

> A. "Yes, but I don't remember all that was in that mortgage and note."

As it appears to us, if by using the word "yes" Mr. Eastburn meant to deny that he and his wife signed the note and mortgage there would have been no reason for the rest of his answer. At any rate a reputable attorney prepared all the papers and it does not appear likely that he would have overlooked a matter so obvious and so important as the wife's signature.

Affirmed.

Justice GEORGE ROSE SMITH not participating.