**ST. PAUL FIRE AND MARINE INSUR-ANCE COMPANY, Plaintiff,**

v.

**John M. HUNDLEY et al., Defendants.**

**Civ. No. LR-70-C-245.**

United States District Court,
E. D. Arkansas, W. D.

Argued July 29, 1972.

Decided Feb. 20, 1973.

Alston Jennings, Wright, Lindsey & Jennings, Little Rock, Ark., for St. Paul Fire and Marine Ins. Co.

Dale Price, Howell, Price, Howell & Barron, Little Rock, Ark., for Dr. John M. Hundley.

Phillip Carroll, Rose, Meek, Nash, Williamson, Carroll & Clay, Little Rock, Ark., for Worthen Bank and Trust Co., and James H. Penick.

## OPINION

PAUL X WILLIAMS, District Judge.

On June 3, 1966, Dr. John M. Hundley was involved in an auto collision with a vehicle operated by Honorable James H. Penick, an official of Worthen Bank and Trust Company of Little Rock, Arkansas. Passengers in the Hundley vehicle were Charles Broussard of Lafayette, Louisiana, and Bruce Hundley of Little Rock.

St. Paul Fire and Marine Insurance Company, Penick's insurer, made a settlement with Bruce Hundley. Dr. John Hundley and Charles Broussard did not immediately assert claims as neither initially felt that he was injured.

On June 7, 1966, four days after the accident, Dr. Hundley was examined and x-rayed by Dr. Charles McKenzie, who made objective findings of injury and started him on a physical therapy program. He was subsequently examined by Dr. McKenzie and on each occasion the reports were sent to St. Paul.

In January of 1967, the muscles in his hands began to selectively atrophy and he was sent by Dr. McKenzie to Dr. Jordan, a neurologist, whose electromyographic studies showed abnormalities. Subsequent x-ray studies showed a compression fracture of the 6th cervical vertebrae.

Two bone grafts were originally performed to fuse the 5th and 6th and the 6th and 7th cervical vertebrae.

One of the grafts dissolved and he was subsequently operated on the second time at Mayo Clinic to again fuse the 6th and 7th vertabrae.

After the car collision, Dr. Hundley continued to practice his profession of Orthopedic Surgery and it was not until September 23, 1967 that he stopped. After he had stopped practicing medicine (2½ years after the accident), Dr. Hundley proceeded to trial in a lawsuit that he had filed against Mr. Penick in the Circuit Court of Pulaski County, Arkansas, wherein he sought damages. The complaint alleged that the negligence of Mr. Penick was the proximate cause of Dr. Hundley's damages.

Although the laws of the State of Arkansas prohibit the disclosure to the jury of the existence of liability insurance, in truth and in fact, St. Paul Fire and Marine Insurance Company had the coverage for Mr. Penick and under the terms of its agreement with Worthen Bank (and Mr. Penick as an insured person) undertook the defense of the case. St. Paul provided able counsel, made thorough and extensive preparation and inquiry into the merits of the case and defended on the theory that Dr.

Hundley's alleged damages were not the result of the negligence of Mr. Penick.

The trial began on December 17, 1968, and concluded on December 20, 1968. At the trial Dr. Hundley testified that in his opinion he was totally and permanently disabled from the practice of his profession, explaining that he not only would never be able to perform orthopedic surgery again, but, also, that he was disabled from performing any of the activities normally required of him in the practice of medicine. Numerous medical experts corroborated his opinion and contention that he was permanently and totally disabled from performing the surgical activities of his profession. On the other hand, evidence was offered on behalf of the defendant to combat the opinions of Dr. Hundley and his experts. Dr. J. L. Richardson, the Orthopedic Surgeon, and Dr. Robert Imler, the Neurosurgeon of Tulsa, Oklahoma, testified that in their opinion Dr. Hundley suffered from a neurological disease. Dr. Imler testified that Dr. Hundley had objective changes with wasting of the small muscles in his left hand; also some in the right hand, also marked diminution of reflex in the left ankle.

The attorneys for St. Paul had obtained complete discovery and ably prepared and presented defense to the claim of the plaintiff.

Prior to the filing of the suit Dr. Hundley had submitted to a sworn question and answer statement which was furnished to St. Paul by its attorney. All x-rays and medical reports by every doctor who examined or treated Dr. Hundley were furnished to St. Paul. He was also, prior to trial, examined by an orthopedic surgeon and a neurosurgeon of St. Paul's choice. His work records at the hospitals, as well as his income and the income of his associate, Dr. McKenzie, were also obtained by St. Paul prior to trial.

Dr. Hundley's loss of income as of the date of the trial as a result of his injuries, was $120,022.

An offer by the plaintiff to settle with St. Paul, prior to trial, for $350,000. was communicated to St. Paul, as indicated by the testimony of their attorney.

No offer to settle or counter-offer was ever made by St. Paul prior to trial, although their attorney notified St. Paul of the possibility of a verdict reaching $500,000.

St. Paul's Vice President, Mr. Branton, testified that rather than attempt to settle they would "take their chances" on a trial.

The case was fully and ably presented by the attorneys on behalf of the plaintiff, Dr. Hundley. It was equally fully and ably defended by the attorneys on behalf of the defendant, Mr. Penick.

The fact that the attorneys for Mr. Penick were actually furnished by the insurer, St. Paul, was not divulged to the jury and no reference was made to that fact. At the conclusion of the trial, the jury returned a verdict for the full amount of the prayer of the complaint, which was for $1,250,000.

Judgment was rendered on the verdict on December 23, 1968, and a motion for new trial was filed on behalf of Mr. Penick on December 27, 1968.

On or about December 31, 1968, St. Paul, insurer of Mr. Penick, made a settlement offer of $500,000, and Dr. Hundley offered to accept $875,000. Subsequently, certain information was developed about members of the petit jury to whom this case was tried, and settlement negotiations were reopened, resulting finally in an agreement on January 15, 1969 to a settlement figure of $500,000. On January 16, 1969, this settlement was consummated by execution of a release by Dr. Hundley and his wife and by entry of an order in the pending lawsuit setting aside the jury verdict and the judgment entered thereon, and dismissing the complaint of Dr. Hundley with prejudice. Additionally, another lawsuit which had been brought by Charles Broussard, a passenger in the

Hundley vehicle, was dismissed with prejudice, although no payment was made by St. Paul to Broussard.

The order of the Pulaski County, Arkansas, Circuit Court was and is as follows:

## "ORDER

On this day comes on to be heard the motion of the defendant praying that the verdict of the jury in this case be set aside and that the judgment heretofore entered be vacated; and the Court, being well and sufficiently advised in the matter and being further advised by counsel for the parties that a settlement of this case has been agreed upon, finds that the verdict and the judgment ought to be set aside and vacated and that the cause of action of the plaintiff, by agreement of the parties, ought to be dismissed with prejudice to the plaintiff.

WHEREFORE, it is by the Court considered, ordered and adjudged that the verdict returned on December 20, 1968, and the judgment entered on December 23, 1968, be and they are hereby set aside and vacated, and that the complaint of the plaintiff be and is hereby dismissed with prejudice.

It is further ordered that the Clerk of this court endorse upon the judgment entered herein on December 23, 1968, the following: 'This judgment is vacated and set aside by order of the Court dated January 16, 1969, and the complaint of the plaintiff is dismissed with prejudice.'

ENTERED January 16, 1969.

/s/ Tom F. Digby
Circuit Judge                "

The recitation of the Order shows that it was vacated only after the Court had been advised that the parties had agreed to a settlement. The release recited "It is further understood and agreed that a certain lawsuit now pending in the Circuit Court of Pulaski County, Arkansas, now bearing No. 66876, wherein John M. Hundley is plaintiff and James H. Penick is defendant, is to be dismissed with prejudice."

Mr. Calvin Branton testified by deposition, as well as in the trial of this cause, that St. Paul was attempting to settle the $1,250,000.00 judgment. Mr. George Koonce, St. Paul's Claim Manager, by deposition, testified that no requirement was made by St. Paul that Dr. Hundley never return again to practice. Mr. Koonce further testified that they became aware that Dr. Hundley was attempting to return to practice approximately February 19, 1969.

The release which is attacked is as follows:

## RELEASE OF ALL CLAIMS

For and in consideration of the payment of the sum of Five Hundred Thousand Dollars ($500,000.00), the receipt of which payment is hereby acknowledged, we, John M. Hundley and Jeanice Hundley, husband and wife, do hereby release, acquit and forever discharge James H. Penick, Worthen Bank and Trust Company, their agents, employees, heirs, administrators, executors, successors, assigns and personal representatives, and any and all other persons, associations, organizations, firms and corporations, whether or not named herein, of and from any and all actions, causes of action, claims and demands which we now have or may hereafter have arising out of or in any way related to any and all injuries and damages of any and every kind, and to both person and property, including not only any and all injuries and damages developed to date but also any and all injuries and damages that might develop in the future sustained by us or either of us as a result of or in any way related to a traffic accident that occurred on June 3, 1966, on Cantrell Road in the City of Little Rock, Pulaski County, Arkansas, in which were involved vehicles operated by John M. Hundley and James H. Penick.

It is understood and agreed that the above payment is in full and final compromise of disputed claims and that said

payment is not to be construed as an admission of any liability on the part of any parties hereby released, by whom any liability is expressly denied, and that the terms of this release are contractual and not a mere recital.

It is further understood and agreed that a certain lawsuit now pending in the Circuit Court of Pulaski County, Arkansas, bearing No. 66876, wherein John M. Hundley is plaintiff and James H. Penick is defendant, is to be dismissed with prejudice.

We have read this release and had it explained to us by our attorney who has signed as a witness hereto, and we understand that this payment is in full and final compromise of any and all claims and causes of action.

EXECUTED this ———— day of January 1969.

/S/ John M. Hundley
—————————————————
John M. Hundley

/S/ Jeanice Hundley
—————————————————
Jeanice Hundley

WITNESS AND APPROVED:

/S/ Dale Price
—————————————————
Their Attorney

After the agreement to settle, Dr. Hundley announced to his associate, Dr. Charles McKenzie, his intention and determination to return to the practice of orthopedic surgery.

In February or March of 1969, Dr. Hundley sought to reestablish his privileges as a staff physician at St. Vincent's Infirmary, one of the two major private hospitals in Little Rock. Prior to April 2, 1969, Dr. Hundley also attempted to reestablish his privileges as staff physician at Arkansas Baptist Medical Center, the other major private hospital.

On July 1, 1969, Dr. Thomas Rooney became associated in the practice of medicine with Dr. Hundley who was at that time engaged in an active office practice. Since his efforts to reestablish his position with the two major hospitals had not been successful, his practice was limited to his office and he had no access to hospital facilities. Ultimately, however, Dr. Hundley's privileges were restored at St. Vincent's Infirmary, and he has now returned to unrestricted practice of orthopedic surgery. Dr. Rooney remained associated with Dr. Hundley for a period of two years, until July, 1971, and he did not observe at any time any disability on the part of Dr. Hundley; nor was he advised by Dr. Hundley that there was an impairment of Dr. Hundley's ability to practice his profession.

On December 22, 1970, St. Paul Fire and Marine Insurance Company commenced this action to recover the $500,000.00 that it had paid on January 16, 1969. St. Paul concedes that the decree should protect the rights of John M. Hundley, Jeanice Hundley, his wife, and Charles Broussard, a passenger in the Dr. Hundley vehicle, to maintain a cause of action against James H. Penick for any injuries or damages allegedly sustained by them, or any of them, in the accident of June 3, 1966, and that St. Paul should be precluded from interposing a defense of *res judicata* or, for a reasonable period of time thereafter, a defense of limitations—in other words, that all rights accruing to these parties at the time of the accident on June 3, 1966, would be restored to them.

The instant action was originally styled:

ST. PAUL FIRE & MARINE INSURANCE COMPANY

vs.

JOHN M. HUNDLEY

By amendment to the complaint filed February 24, 1971 Worthen Bank and Trust Company and James H. Penick were made parties defendant.

By its order dated June 10, 1971 this court declared:

"The court simply does not think that a liability insurance carrier can maintain an action to rescind a settlement that has been negotiated and consummated for the benefit of the insured without joining the insured as a party

to the action and in such an action the interests of the insurance company and the insured are legally adverse regardless of the fact that due to the circumstances of a particular case the insured may not object to rescission provided that the insurance company will give him full indemnity if he is sued again and if a judgment in excess of policy limits is secured against him.

While plaintiff contends that Penick has no business in the case, counsel for plaintiff concedes that the matter of additional parties rests at least to some extent in the discretion of the court.

In its discretion the court thinks that Mr. Penick ought to stay in the case and because of the legal, if not actual, adverseness of interest between plaintiff and Penick, the court adheres to its initial view that Penick should be aligned as a defendant."

---

The plaintiff insurer contends that the release should be set aside on the ground of fraud and that it have judgment against Dr. John Hundley for $500,000.00 plus accrued interest.

The defendant, Dr. Hundley, contends that the insurer of Mr. Penick has no standing to bring this action since there is no privity of contract—that no fraud was committed—and that even if there had been, laches would prevent plaintiff from prevailing in this late action.

---

In view of the fact that Mr. Penick is actually a party to this action and it was for him and his benefit that the $500,-000.00 was paid, the Court will directly concern itself with the question of fraud and devote no time or discussion to the lack of privity.

■ The burden of proving fraud is on the plaintiff. The court finds that this burden has not been met—on the contrary the court finds that a settlement was consummated between the parties, both of whom were ably represented by highly competent counsel, after both parties and their counsel had full benefit of discovery, thorough study, and an ac-

tual trial of a case in Pulaski Circuit Court resulting in a jury verdict of $1,250,000.00.

Plaintiff urges that this court should find Dr. Hundley guilty of fraud because he stated his opinion concerning his own physical condition. This court finds that Dr. Hundley and the other experts who testified in the State Court gave their honest, best opinions at the time they and each of them testified. Not all the expert opinions favored Dr. Hundley, but the jury, under uncomplained of instructions from the court, determined the weight and credibility of the evidence and returned a verdict for $1,250,000.00 in favor of Dr. Hundley. Had the jury seen fit to credit the testimony offered by the experts of the insurance company the verdict would doubtless have been for Mr. Penick and against Dr. Hundley.

Plaintiff urges that subsequent events have proved that Dr. Hundley was not disabled—that he is now able to and does practice his profession.

Conceding, only for sake of argument, that Dr. Hundley is now completely recovered and is practicing his profession with the same skill as before the car collision, can we say that no part of the restored skill in his art is attributable to the fusion of his vertebrae—or that his perserverance in working and reacquiring skill plays no part in his recovery?

## THE RELEASE MUST BE JUDGED BY THE FACTS AS THEY EXISTED AT THE TIME OF ITS EXECUTION

■ In Hutcheson v. Frito-Lay, 315 F.2d 818 (8th Cir. 1963) the Court of Appeals (Vogel, Blackmun and Ridge) in affirming Judge John E. Miller reviewed the law in Arkansas with regard to setting aside releases and in the opinion stated:

"In the light of subsequent events it may well be that the consideration paid for the release was inadequate to compensate the plaintiffs for the personal injuries sustained by Lena

Hutcheson. *The release, however, must be judged by the circumstances and conditions existing at the time of its execution. The adequacy or inadequacy of the consideration may not be viewed in the light of after events."* (Emphasis supplied.)

What Dr. Hundley's condition was, as of the date of the release, is controlling as to the validity of the release.

*(A) There Was No Fraud or Mistake*

No doctor disputes the fact that at the time of the trial Dr. Hundley's healing period had not ended. Dr. Jordan, by deposition, testified:

Q. At the time you testified in this case his healing period had not ended, had it?

A. As I recall, that's correct. If I be incorrect in that recollection, but that's the best recollection I have.

Q. He had only been postoperative for a relative short period of time?

A. As I remember; yes, sir.

Dr. Christian testified in this trial that at the time of the original trial Dr. Hundley's injury had not healed.

Dr. McKenzie, at this trial, also testified that Dr. Hundley's healing period had not ended as of the date of the original trial.

Dr. Steele, in this trial, testified to the same effect.

In Robinson v. Williams, 231 Ark. 166, 328 S.W.2d 494 (1959) the rule of law governing fraud was set forth as follows:

" . . . There is no rule more firmly established than the one that fraud will not be presumed, and the burden is on the party alleging it to prove it by a preponderance of the evidence which is clear and convincing."

Also, in National Life & Accident Ins. Co. v. Hitt, 194 Ark. 691, 109 S.W.2d 426 (1937):

"Corpus Juris, V. 26, p. 1131, states the following rule as to fraud: 'An honest but erroneous expression of opinion or belief is not fraud. Since a statement concerning a matter not susceptible of exact knowledge by the speaker is no more than expression of a belief, one making such a statement in good faith is not liable for its falsity. The rule may apply, although the statement was made in terms of positive personal knowledge, the test being the character of the facts asserted to be true rather than the form of the assertion.' "

"A recent decision by the Circuit Court of Appeals for the Eighth Circuit, Pacific Mutual Life Insurance Co. of California v. Jacob, 87 F.2d 870, held that a mutual mistake of the insurer and the insured as to probable future duration of insured's disability would not justify cancellation of an agreement compromising and settling claim for disability benefits and cancelling disability clause of a life policy."

Also, in Ryan v. Batchelor, 95 Ark. 375, 129 S.W. 787 (1910), the Supreme Court of Arkansas stated:

"Now, before a representation will be considered fraudulent in law so as *to give a right of action therefor, it* must be made relative to a matter susceptible of accurate knowledge, and must be a statement imparting knowledge on the part of the person making the representation; and it must also be relied on as such. If the statement was made only as an expression of opinion, or if it was not made in a manner so as to induce the other to act in reliance thereon, then such representation, even though not true, would not be sufficient to base an action thereon for deceit. In the case of Yeates v. Pryor, 11 Ark. 58, this Court said: 'The misrepresentation, in order to affect the validity of the contract, must relate to some matter of inducement to the making of the contract in which from the relative position of the parties and their means of information the one must necessarily be presumed to contract upon the faith and trust which he re-

poses in the representation of the other on account of his superior information and knowledge in regard to the subject of the contract, for if the means of information are alike accessible to both, so that with ordinary prudence or vigilance the parties might respectively rely upon their own judgment, they must be presumed to have done so, or, if they have not so informed themselves, must abide the consequences of their own inattention and carelessness.' "

Can it reasonably be said that St. Paul relied solely upon Dr. Hundley's statement that in his opinion he could not practice orthopedic surgery in the future? At most, this was an expression of his opinion as to his future abilities at a time when (1) his healing period had not ended and (2) the other doctors were of the same opinion.

Can it be reasonably said that St. Paul relied solely upon Dr. Hundley's opinion of his future abilities when they had hired two experts in the fields of orthopedics and neurology to independently ascertain his condition?

Or is it more reasonable to believe that Dr. Hundley's ability to practice in the future had nothing to do with St. Paul's settlement—that they were merely trying to settle a judgment?

St. Paul's Vice-President, Mr. Branton, said under oath they were settling a judgment, and their State Claims Manager stated that Hundley's promise not to return to practice was not a part of the consideration obtained by St. Paul.

No doctor disputed or disputes Dr. Hundley's disabled condition to practice orthopedic surgery as of the date of the trial. Each doctor who was asked concerning his evaluation of Dr. Hundley's future condition to practice orthopedic surgery stated he thought Dr. Hundley could not and should not practice, with the exception of Dr. Ed Henderson of Mayo Clinic, whose testimony was as follows:

Q. What is that opinion, based in terms of percentages?

A. That he has a permanent disability to his body. I can be quite sure of the disability to his neck; I can't be a hundred percent sure about a permanent disability in his left upper extremity.

Q. All right. What percentage would you attribute to the permanent disability to the neck?

A. I would estimate twenty percent.

Dr. Henderson's testimony was at least substantial enough to leave some doubt as to Dr. Hundley's future ability to practice.

In any event, St. Paul had two specialists of their choosing who independently examined Hundley and whose findings and knowledge were available to St. Paul.

There was no fraud or fraudulent representation since the testimony of each doctor related his own expert opinion as to a future condition of Dr. Hundley and his ability to function as a surgeon in the future.

Mr. Branton, of St. Paul, in his deposition testified:

Q. There never was any question about who was at fault in the accident, was there?

A. Not in my mind.

Q. And the party being at fault in the accident was Mr. Penick?

A. That's correct, in my opinion.

     *     *     *     *     *     *

Q. Mr. Branton, you don't rely on just what a claimant says or the extent of his injuries or damages, do you, in evaluating a claim?

A. No, I do not.

Q. As a matter of fact, you always look with a little bit of suspicion as to what a claimant might be saying about his damages?

A. Yes. I might discount my evaluation somewhat.

Q. You don't necessarily accept them at face value just without reservation, do you?

A. No, I would not.

Q. As a matter of fact, you all go to some, not extreme, but go to some length to verify in your own mind what those damages actually are independently of what the claimant may have said?

A. Yes, we do.

\* \* \* \* \* \*

Q. Well, the point I'm trying to make is that you all had this independent examination made by your orthopedic surgeon and neurosurgeon. Now, isn't it a very important factor in any lawsuit for permanent disability, whether it be partial or total, to ascertain the nature and extent of that disability?

A. Yes, it does.

Q. Can you give me any reason why you did not pursue that factor to try to find out what the total nature of his disability would be?

A. No, I cannot.

\* \* \* \* \* \*

Q. Mr. Branton, at the time you authorized a settlement in this case, would it not be a fair statement to say that you were attempting to settle the million two hundred and fifty thousand dollar judgment?

A. Yes, I was.

Q. And you were attempting to settle that judgment rather than the settlement of a personal injury claim based necessarily upon the various elements of damages that you would normally take into consideration?

A. Yes. I believe that would also be true.

The fact that Dr. Hundley might practice medicine and/or surgery in the future was not a consideration to St. Paul.

Calvin Branton also testified:

Q. As part of the consideration that Doctor Hundley was going to give you for settlement of this judgment in settlement of his claim, was any requirement made of him

that he not practice medicine in the future?

A. No, there was not.

Mr. Koonce of St. Paul also testified:

Q. Mr. Koonce, as part of the settlement of the Hundley claim was there any requirement made by St. Paul or by you or on behalf of St. Paul that you might have knowledge of that Hundley never practice again?

A. No.

More importantly, Dr. Hundley made no representations to St. Paul in settlement.

## RESTORATION OF STATUS QUO

■ If rescission of the release should be granted, the parties should be restored to status quo.

If rescission were granted, the question then posed is: "What was the status of the parties when the settlement was reached and what consideration did Dr. Hundley relinquish by reason of the release?

When the agreement was reached and the release was executed Dr. Hundley was in possession of a judgment for $1,250,000.00 with a motion for new trial and an amendment thereto pending and unacted upon by the trial court.

George Koonce, St. Paul's claim manager for Arkansas, testified that no one knew what the court was going to do on the motion for new trial.

Q. But St. Paul never attempted by way of negotiation to make a counter-offer or attempt to settle the claim prior to trial?

A. No.

Q. And my statement that you just decided to take the chances before a jury is correct, isn't that right?

A. We had no other choice with the evaluation we had placed on the file.

Q. You had the choice of a counter-offer, did you not?

A. We saw no use in making it.

Q. But you did have a chance to make a counter-offer did you not?

A. I suppose we had the chance, yes.

Q. Now, in light of the fact that you just testified to, that you thought your chances were excellent for a new trial, you had the opportunity to stand on your Motion for a New Trial and pursue that to its conclusion, did you not?

A. That's right.

Q. And you had the opportunity to take your chances before a second jury, did you not?

A. That's right.

Q. Or you thought you would have?

A. If the judge had granted a new trial we would have.

Q. And if he hadn't granted a new trial then you had to worry about an appeal?

A. That's correct.

Q. And you have no way, you had no way of knowing what would occur to the judgment, if anything, on appeal.

A. No.

Mr. Calvin Branton, Vice President of St. Paul, very candidly testified that what they were trying to settle was the judgment and not trying to settle a personal injury claim.

Q. Mr. Branton, at the time you authorized a settlement in this case, would it not be a fair statement to say that you were attempting to settle the million two hundred and fifty thousand dollar judgment?

A. Yes, I was.

Q. And you were attempting to settle that judgment rather than the settlement of a personal injury claim based necessarily upon the various elements of damages that you would normally take into consideration?

A. Yes. I believe that would also be true.

That the Pulaski Circuit Judge set aside the verdict, ordered a new trial and dismissed the case with prejudice, all in the same order, based on the agreement, is borne out by the very wording of the Order.

"ORDER

On this day comes on to be heard the motion of the defendant praying that the verdict of the jury in this case be set aside and that the judgment heretofore entered be vacated; and the Court, being well and sufficiently advised in the matter and being further advised by counsel for the parties that a settlement of this case has been agreed upon, finds that the verdict and the judgment ought to be set aside and vacated and that the cause of action of the plaintiff, by agreement of the parties, ought to be dismissed with prejudice to the plaintiff."

Interrogatory No. 1 propounded to plaintiff the following question:

INTERROGATORY NO. 1: State the terms of the settlement that was agreed upon as mentioned in Paragraph 8 of the Complaint, giving the details of the conditions required by St. Paul and Penick concerning the following:

(a) The setting aside of the Hundley verdict;

ANSWER: * * * when a settlement figure was agreed upon, it was also agreed that Dr. Hundley would not oppose the motion for a new trial.

(b) The dismissal of the case with prejudice;

ANSWER: As part of the settlement agreement, it was agreed that after the verdict and judgment in favor of Dr. Hundley had been set aside and a new trial granted that the case would be dismissed with prejudice on motion of Dr. Hundley.

The general rule of law governing the question presented is set forth in 15A C.J.S. Compromise & Settlement § 41b, p. 265:

"It is a general rule, subject to the exceptions stated in the next subdivision of this section, that where a party to a compromise desires to set aside or avoid it and to be remitted to his original rights, he must, in the absence of sufficient excuse, place the other party in statu quo by returning or tendering the return of whatever benefit or consideration has been received by him under such compromise, in case it is of any value, and as far as possible any right lost by the other party because thereof."

As early as 1896, in the case of Harkey v. Mechanics' & Traders' Ins. Co., 62 Ark. 274, 35 S.W. 230 at page 231, the Arkansas rule has been as stated in the case:

"This case rests on the rule that one who receives money or property in consideration of making an agreement, and afterwards seeks to avoid and hold for naught such agreement, must first give back to the other party the consideration received."

This rule was subsequently followed in Pekin Cooperage Co. v. Gibbs, (1914) 114 Ark. 559, 170 S.W. 574:

"Whatever reason originally may have prompted the distinction which the courts have made between the cases where the consideration must be returned and those cases where that requirement is not exacted, the rule appears to be that, as a condition precedent to the recission of an accord and satisfaction, or a release, where the accord was made or the release given as the result of fraud practiced in their procurement, the consideration must be returned or tendered before the suit can be maintained."

In 1963, in the case of Coddington v. Safeguard Ins. Co. of N.Y. et al., 237 Ark. 457, 373 S.W.2d 413, at page 417 the Arkansas Supreme Court said:

"As a general rule, one who seeks to avoid the effect of an accord and satisfaction on the ground of fraud, mistake, or for any other reason (it is apprehended) must restore or offer to restore to the other party whatever he has received by virtue of the transaction. The rule, however, is subject to some limitations and exceptions. It does not apply where the agreement is absolutely void, * * *."

The judgment was what Dr. Hundley gave up and that is what he asks be returned to restore his status quo, should this Court order rescission. St. Paul has not and cannot agree to restore the judgment to Hundley.

## CLAIM OF JEANICE HUNDLEY

Jeanice Hundley, Dr. Hundley's wife, was not a party to the action against Penick when judgment was entered.

St. Paul acknowledged that the Hundley case was one of liability and that Penick was at fault. Mr. Branton testified:

Q. There never was any question about who was at fault in the accident, was there?

A. Not in my mind.

Q. And the party being at fault in the accident was Mr. Penick?

A. That's correct, in my opinion.

While Jeanice Hundley acknowledges her claim to be derivative, her execution of the release and the extinguishing of her claim was not sought by her. It was sought and obtained by St. Paul by making it a part of the settlement agreement with Dr. Hundley. St. Paul Vice President Branton testified:

Q. In addition to this, as part of the consideration that Doctor Hundley was going to give to you, you required that he obtain his wife's signature on the release to extinguish any possible claim that she might have against Mr. Penick, did you not?

A. I believe this is correct.

By the stipulation filed in this case between St. Paul and Jeanice Hundley, St. Paul stipulated:

"4. Jeanice Hundley made no representations in connection with this matter, and St. Paul Fire and Marine Insurance Company was not, therefore, relying upon any alleged representations by Jeanice Hundley and St. Paul does not claim that Jeanice Hundley perpetrated any fraud on it."

To be entitled to relief against Jeanice Hundley, St. Paul has the burden of proving fraud on her part by clear and convincing evidence and they have stipulated there was none.

Mr. Branton testified with reference to her claim as follows:

Q. What was your evaluation of Mrs. Hundley's claim that you settled in this settlement? What was it's value?

A. Well to me, Mr. Price, the two were combined with the one as far as the settlement authorization that I extended.

Q. In offering this settlement, you merely lumped her claim in there without assigning to it any specific sum of money as being its value?

A. That's correct.

Q. And you did recognize that under Arkansas law she has a claim? She had a claim for loss of consortium?

A. Yes. I was so advised.

Q. And you cannot tell me which part of this $500,000.00 settlement was set off in settlement of her claim or what was set off to his claim only, Doctor Hundley's claim only?

A. No, I cannot.

## RES ADJUDICATA, ESTOPPEL, LACHES AND RATIFICATION

St. Paul alleged in its complaint, that Dr. Hundley returned to practice February 1, 1969. Mr. Koonce testified he was aware Dr. Hundley was attempting to return to practice on February 19, 1969, and that he discussed it with their attorney who had told him about it. Vice President Branton testified that he learned that Dr. Hundley was going back into practice within 30 days following the settlement. The release is dated January 16, 1969.

St. Paul's very able and proficient counsel testified in this trial that he knew that the term time in Pulaski County was the first Monday in March and the 3rd Monday in September, and that the statute of limitations for personal injury suits was three years.

St. Paul let the term time expire, depriving the Pulaski Circuit Court of jurisdiction over the order of dismissal, the order granting the new trial, the judgment, and even more important, the power to re-instate the judgment.

■ Jurisdiction cannot be conferred where none exists even by agreement.

St. Paul also waited until after the statute of limitations had expired on Dr. Hundley's claim, Jeanice Hundley's claim and Charles Broussard's claim before instituting suit.

Term time ran March 3, 1969. Limitations ran on June 3, 1969, and suit was not instituted until December 22, 1970. Dr. Hundley and Mrs. Jeanice Hundley's claims are barred by the statute of limitations, term time and res adjudicata.

This also precluded Charles Broussard from even prosecuting a claim, particularly since he was not a party to this suit and since the Pulaski Circuit Court has lost jurisdiction.

As stated in plaintiff's Answer to Interrogatories, No. 1(b): "As part of the settlement agreement, it was agreed that after the verdict and judgment in favor of Dr. Hundley had been set aside and a new trial granted that the case would be dismissed with prejudice on the motion of Dr. Hundley." This was done. (Hundley Affidavit)

In Doan v. Bush (1917) 130 Ark. 566, 198 S.W. 261, it was held:

"It has been frequently decided by this court that the legal deduction from a judgment dismissing a suit 'agreed,' is that the parties had, by their agreement, adjusted the subject-matter of controversy in that suit; and the legal effect of such a judgment is, therefore, that it will operate as a bar to any other suit between the same parties, on the identical cause of action thus adjusted by the parties, and merged in the judgment thereon rendered, at their instance, and in consequence of their agreement.

\* \* \* \* \* \*

"The legal effect of an order dismissing a suit agreed is to bar any other suit between the same parties, on the original cause of action thus adjusted by them."

The order of dismissal with prejudice was an agreed judgment. In Arkansas, once a final judgment or order has been entered and the term of court has passed, the court is powerless to set its prior order or judgment aside except for grounds set forth in Ark.Stat. 29–506 as follows:

"29–506. *Grounds for vacating or modifying judgment by trial court.—* The court in which a judgment or final order has been rendered or made, shall have power, after the expiration of the term, to vacate or modify such judgment or order.

First. By granting a new trial for the cause, and in the manner prescribed in section 375 [§ 27–1906].

Second. By a new trial granted in proceedings against defendants constructively summoned, as prescribed in Chapter I, of Title X [§§ 27–1907—27–1910]

Third. For misprisions of the clerk.

Fourth. For fraud practiced by the successful party in the obtaining of the judgment or order.

Fifth. For erroneous proceedings against an infant, married woman or person of unsound mind, where the condition of such defendant does not appear in the record, nor the error in the proceedings.

Sixth. For the death of one of the parties before the judgment in the action.

Seventh. For unavoidable casualty or misfortune preventing the party from appearing or defending.

Eighth. For errors in a judgment, shown by an infant in twelve (12) months after arriving at full age, as prescribed in section 423 [§ 29–117]

[Civil Code, § 571; C. & M.Dig., § 6290; Pope's Dig., § 8246.]."

Although the fourth ground set forth in the statute mentions fraud, the Arkansas Supreme Court has uniformly held that this means extrinsic fraud. None of the grounds enumerated in the statute are applicable to this case. Davis v. McBride, 247 Ark. 895, 448 S.W.2d 37 (1969); Johnson v. Lumbermen's Reciprocal Ins. et al., 249 Ark. 550, 460 S.W.2d 53 (1970).

In Hardin v. Hardin (1963) 237 Ark. 237, 372 S.W.2d 260, at page 262, it is said:

"One of the earliest cases to construe the statute which is now Sec. 29–506 was Izard County v. Huddleston, 39 Ark. 107. In that case we said, 'The statute to vacate judgments by this proceeding is in derogation not only of the common law, but of the very important policy of holding judgments final after the close of the term. Citizens must have some confidence in the judgments of our judicial tribunals, as settlements of their controversies, and there should be some end to them. Unless a case be clearly within the spirit and policy of the act, the judgment should not be disturbed.' "

Plaintiff had only one cause of action against Mr. Penick and that was disposed of by a final order of dismissal

with prejudice. No new cause of action exists for those same personal injuries and damages and unless and until the Pulaski Circuit Court could set aside the judgment no new or additional cause of action would lie. The parties could not even agree to retry a case finally disposed of since the trial court lost jurisdiction of the matter after term time. The parties could not confer jurisdiction even by agreement where none existed. Wear v. Boydstone, 230 Ark. 580, at page 584, 324 S.W.2d 337, at page 339:

"We have many times held that courts lose jurisdiction of judgments and decrees with lapse of the term in which they were rendered, and they can thereafter only be set aside by establishing one of the grounds mentioned in the statute previously cited."

In St. Louis-San Francisco Ry. Co. v. Hall (1930) 182 Ark. 476, 32 S.W.2d 440, it was stated:

". . . if he had been deceived, he learned the truth, and it was then his duty to disaffirm the contract as quickly as reasonable diligence would allow, and, having failed to do so and deriving all possible benefit from the transaction, he cannot now be relieved, as by his conduct he has waived all benefit of, and relief from, the representations."

Also, in Minton v. Hall (1950) 218 Ark. 92, 234 S.W.2d 515:

"What was said in the case of St. Louis-San Francisco Railway Company v. Hall, 182 Ark. 476, 32 S.W.2d 440, 443, applies here. It was there held: (Headnote 3) 'Where plaintiff took advantage of a settlement paid for release from liability after knowledge of alleged misrepresentations, he will be held to have ratified the settlement', and in the body of the opinion, we said: 'Assuming that the release had been procured, as alleged by the appellee, his taking advantage of the settlement by depositing the check to his credit was a ratification of such release, for, if he had been deceived, he learned the truth, and it was then his duty to disaffirm the contract as quickly as reasonable diligence would allow, and, having failed to do so and deriving all possible benefit from the transaction, he cannot now be relieved, as by his conduct he has waived all benefit of, and relief from the misrepresentations. Wilson v. Strayhorn, 26 Ark. 28; Lamden v. St. Louis S. W.R. Co., 115 Ark. 238, 170 S.W. 1001; McCormick v. Daggett, 162 Ark. 16, pages 22 and 23, 257 S.W. 358, and cases therein cited.' "

See also Squires v. Beaumont (1961) 233 Ark. 489, 345 S.W.2d 465, at page 467:

"Assuming that the release had been procured as alleged by the appellee, his taking advantage of the settlement by depositing the check to his credit was a ratification of such release, for if he had been deceived he learned the truth and it was then his duty to disaffirm the contract as quickly as reasonable diligence would allow, and, having failed to do so and deriving all possible benefit from the transaction, he cannot now be relieved as by his conduct he has waived all benefit of, and relief from the misrepresentations."

This court had occasion to apply the aforestated principle in the case of Roemhild v. Jones (E.D.Ark.1959) 178 F.Supp. 609, where the following language was used:

"Aside from any question of the applicability of the statute of limitations, it is a well settled principle of Arkansas law that a party desiring to rescind a contract must proceed with reasonable diligence after his right to rescind arises and comes to his knowledge, and that a failure on his part to do so amounts to a waiver of that right. Jones v. Gregg, 226 Ark. 595, 293 S.W.2d 545; McCormick v. Daggett, 162 Ark. 16, 257 S.W. 358; Kilgo v. Continental Casualty Co., 140 Ark. 336, 215 S.W. 689, and Fitzhugh v. Davis, 46 Ark. 337. Such waiver may arise from a delay for far less

time than the statutory period of limitations.   Ibid."

It is the conclusion of the court that the complaint of the plaintiff is without merit and should be dismissed with prejudice.

All costs of this case shall be adjudged against the plaintiff.