**SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY, Plaintiff,**

v.

**John Fuller BURNEY, a/k/a John Bruce; Bonnie Burney; and Gerry Barr, Loyall Barr, and C.P. McCarty, Sr., Individually and as Members of the Board of Directors of Helena Rice Drier, Inc., Defendants.**

**No. LR–C–83–589.**

United States District Court, E.D. Arkansas, W.D.

July 27, 1984.

William H. Sutton, and James M. Simpson, Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

L. Ashley Higgins, Roscopf & Higgins, Helena, Ark., for defendant John Fuller Burney.

David Solomon, Helena, Ark., for defendant Bd. of Directors.

Sidney S. McMath, Little Rock, Ark., for defendant Bonnie Burney.

## MEMORANDUM OPINION

ROY, District Judge.

This is an unusual and rather bizarre case. Plaintiff Southern Farm Bureau Life Insurance Company has instituted this action to recover from defendants John Fuller Burney, a/k/a John Bruce; Bonnie Burney (Robinson)[1]; and Gerry Barr, Loyall Barr, and C.P. McCarty, Sr., individually and as members of the Board of Directors of Helena Rice Drier, Inc., certain sums paid under policies insuring the life of John Burney.

Helena Rice Drier, Inc., was a storage facility for grain and beans, located in Helena, Arkansas. During the relevant period in this case, John Burney was president of the corporation and defendants Gerry Barr, Loyall Barr, and C.P. McCarty, Sr., were members of the Board of Directors of Helena Rice Drier, Inc. Bonnie Bumpers was legally married to John Burney during this time and they had two children.

In January 1976 John Burney was a respected member of the Helena, Arkansas, community. He had an attractive wife and two children.

■ Due to bad management practices for some considerable period of time, it

1. Now remarried.

became apparent in late April and early May that because of serious financial difficulties, Helena Rice Drier, Inc., could not meet its obligations. On May 7, 1976, John Burney arranged a meeting of the farmers who had stored crops at the Helena Rice Drier (many were his friends and neighbors) and he reported that the Helena Rice Drier had no money to pay them and no soybeans in the drier.

Most of the farmers who had lost beans in the failure were angry and at least one person threatened to take John Burney's life. Several lawsuits naming John Burney and the Board of Directors of the Rice Drier as defendants were filed because of their losses. Burney's prior arrangement to purchase farm land collapsed, and he lost the farming equipment that he had slowly accumulated during the preceding years.

By June 11, 1976, John Burney's future in Helena appeared bleak. According to his testimony, during the evening of that day, on his way home, he had to cope with a series of frustrating electric failures in his truck. He testified that while driving toward Helena over the Mississippi River bridge he saw the lights of an on-coming car appear over the crest of the bridge approaching him in his lane of traffic. He pulled the truck to the right to avoid the car and struck the bridge railing. When the truck stopped, John Burney slipped out of the cab. The other vehicle had stopped on the bridge and he could see people getting out and hear them shouting. Alarmed, John Burney slipped over the railing of the bridge, worked his way down a piling, and dropped into the river and swam downstream a short distance. After coming to the east bank of the river he walked to central Mississippi, where he caught a southbound bus. He drifted for the next few months until he settled in Key Largo, Florida.

From the night John Burney departed Helena, Arkansas, he called himself John Bruce. It is undisputed that he told no one his true identity for over six years. He did not resurface until after the Arkansas five

year presumption-of-death statute had run. *Ark.Stat.Ann.* § 62–1601. He now lives in Key Largo, Florida, with his second wife whom he married without being divorced his first wife. They have a child.

After John Burney left Helena, Arkansas, he ignored his legal and moral obligations, including his legal duty to support his wife and family and his responsibilities concerning the Helena Rice Drier, Inc. He caused great anxiety by not notifying them or even his own parents that he was in fact alive.

For a period of over six years John Burney consistently lied about his identity and day after day misrepresented not only himself but all other facts about his background. He carried his fraud to the point of falsifying records required by governmental authorities, including falsifying Social Security information and marriage application records indicating that he had never been married before. He failed to file federal income tax returns and pay taxes to the United States Government.

At trial John Burney testified that he left every aspect of his life in Helena, leaving the impression that he was deceased. He was aware of the presumption of death law (but testified that he thought it was seven years instead of five years). He designed every relevant phase of his life to deceive everyone, including the insurance companies.

The overwhelming weight of evidence, almost undisputed, shows that John Burney, a/k/a John Bruce, was guilty of fraud. As the court said in *New York Life Insurance Co. v. Nashville Trust Co.*, 200 Tenn. 513, 292 S.W.2d 749, 754 (1956), about an insured who stayed hidden under very similar circumstances: "We cannot imagine how acts could be more fraudulent." As long ago as 1846 the Arkansas Supreme Court said that fraud consists in the misrepresentation or concealment of a material fact calculated to deceive and mislead. *Dillard's Administrator v. Moore*, 7 Ark. 166 (1846).

Defendant John Burney argues that his deception had no bearing on the payment

of the insurance proceeds and furthermore that he has received none of the funds paid and has not been unjustly enriched. The Court finds no merit in these contentions.

John Burney was a knowing, participating party to every insurance contract. His fraud permeated the relationships of all of the parties to the degree that any payment or agreement accepted by the parties was a result of the deliberate deception practiced by him.

Because of John Burney's fraud and deception, money was paid on the insurance policies and he is indebted to plaintiff for the sum of $90,000.00 on th policy, payments made to Bonnie Burney and $380,-000.00 for the payments made to the directors of Helena Rice Drier, Inc.

We now consider the case of Bonnie Burney which differs from that of John Burney.

Plaintiff contends the settlement should be set aside because of fraud, mutual mistake of fact and unjust enrichment.

John Burney resurfaced on December 1, 1982, and returned to Arkansas to visit with his father after having been injured in an industrial accident. He wanted to file suit, and his attorney told him that he would have to make complete disclosure of his past. When this information was conveyed to Bonnie Burney, she immediately, on December 2, 1982, notified Southern Farm Bureau Life Insurance Company that John Burney was not dead.

The Court finds the following evidence supports the position of Bonnie Burney that she acted in good faith, was not guilty of fraud, and that there was no mutual mistake of fact:

1. The Helena Rice Drier truck that John Burney was driving on June 11, 1976, was found wrecked on the Arkansas-Mississippi River Bridge.

2. Hand prints were found on the bridge railing near the truck.

3. The river was dragged and searched and no body was found. However, a body was sighted downriver by two fishermen about two weeks later but was not recovered.

4. Sgt. Tommy Baker of the Arkansas State Police, completing his investigation, advised Bonnie Burney that in his opinion John was dead—that he either took his own life or was killed.

5. Fred Myers, a private investigator, completing his investigation on the limited funds available, reported to Bonnie Burney that it was his opinion that John was dead.

6. The family relationship between John Burney and his wife and children was a good relationship. Bonnie did not believe her husband would leave her and their children.

7. The family had a memorial service at the Methodist Church in Helena. John Burney's daughter, Paula, then seven years of age, participated in the services by reading selected passages from the Scripture.

8. Bonnie Burney is the daughter of Reverend Paul Bumpers, a distinguished Methodist minister. This family would not have conducted the service and placed a gravestone in the cemetery in memory of John Burney had they not fully believed him to be dead.

9. John Burney never communicated with his wife and children or his own parents.

Southern Farm apparently believed John Burney to be alive as indicated by the following:

1. In the complaint of Bonnie Burney on Policy No. 493376A she alleged that "on June 11, 1976, John Fuller Burney was killed ..." In response to this allegation Southern Farm answered, "... Defendant denies that the said insured is dead."

2. Bonnie Burney in her complaint on Policy No. 641625 stated that "on June 11, 1976, John Fuller Burney was killed ..." In response to this allegation Southern Farm answered, "... Defendant denies that the said insured is dead."

3. The date of issue of the "home" policy with the face value of $48,250.00 was

June 13, 1973. John Burney disappeared on June 11, 1976. Southern Farm sent quarterly premium notices to Bonnie on this policy, which premiums were paid by her and were received by Southern Farm. These premiums were paid by Bonnie Burney from June 11, 1976, through December 13, 1981.

4. The date of issue of the "retirement" policy with a face value of $37,313.00 was 1975. Southern Farm sent quarterly premium notices on this policy and they were paid by Bonnie Burney and received by Southern Farm beginning after June 11, 1976, and continuing through November 19, 1981.

5. The total of premiums paid on these two policies by Bonnie Burney to Southern Farm was $14,190.00. It is to be noted that premium notices were received from Southern Farm and paid after the running of the presumption of death statute which would have been June 11, 1981.

The pertinent clause in the settlement contract reads as follows:

> It is understood and agreed that this is a compromise settlement of <u>doubtful and disputed claims</u>, that <u>the payment made shall not be construed as an admission of liability on the part of the parties released by whom liability is denied</u>, that payment is made and received in full and complete satisfaction of the aforesaid action, causes of action, claims and demands, that this release contains the entire agreement between the parties, and that the terms of this release are contractual and not a mere recital." (Underscore supplied)

Southern Farm now contends it believed John Burney to be dead when the case was settled. However, Southern Farm made no payments under the provisions of the policy to Bonnie Burney although the expiration of the presumption of death statute was six months earlier. The face value of the two policies was $85,563.00 plus $14,190.00 in premiums, which totaled $99,753.00. The claim was compromised for $90,000.00, which was less than Southern Farm's exposure.

Had a jury determined at the scheduled trial that John Burney was dead and fixed the date of death as June 11, 1976, Southern Farm would have been obliged to return all premiums paid subsequent to June 11, 1976.

By entering into this agreement, Bonnie Burney gave up her right, in the event that John Burney's body was found, to seek additional payment from the insurance company for the premiums, attorney's fees, and prejudgment interest.

Southern Farm's present position that they believed Burney to be dead, hence laying a foundation for a mutual mistake of fact, is not convincing.

Southern Farm could have drafted the release contract on the assumption by both parties that John Burney was dead, or they could have gone to trial. They did neither. They calculated their alternatives and made a "business decision to settle the case."

The sequence of proceedings leading up to settlement is relevant. Bonnie Burney filed suit on her two claims on March 17, 1977.

Discovery proceedings were carried out, depositions taken, Bonnie Burney was deposed December 5, 1977.

Trial date was set for April 17, 1982. December 1, 1981, the Court issued an order directing that a settlement conference be held by the attorneys.

Settlement negotiations were conducted and a release was executed by Bonnie Burney on January 26, 1982.

Order of Dismissal because the case had been settled was entered January 26, 1982.

The settlement of cases and controversies is strongly favored by public policy since settlement of cases helps to relieve the court calendar of congestion and speeds the process of justice.

■ Settlements allow both sides to win something and represent final case disposition because there is no appeal.

■ Settlement contracts, absent fraud or a genuine mutual mistake of fact, should be upheld.

In the case of *St. Paul Fire and Marine Insurance Co. v. Hundley*, 354 F.Supp. 655 (E.D.Ark.1973), the release used in contracting a settlement of a personal injury claim between Dr. Hundley and St. Paul Fire and Marine Insurance Company contained a clause identical with the one used by Southern Farm herein. Dr. Hundley obtained a verdict of $1,250,000. A motion for a new trial was filed. A compromise settlement was entered into wherein Dr. Hundley was paid $500,000. At the trial Dr. Hundley had testified that he was permanently disabled from engaging in his practice as an orthopedic surgeon. Shortly after the settlement Dr. Hundley resumed his surgical practice. The insurance company sought to have the settlement canceled because of fraud. Judge Paul X Williams held the release contract was binding and constituted a contract of settlement between the parties. Judge William quoted the case of *Hutcheson v. Frito-Lay, Inc.*, 315 F.2d 818 (8th Cir.1963). In the *Frito-Lay* case the insured was in an automobile accident. She filed a claim for damages to her automobile stating that she had no personal injuries and executed a release. Subsequently she found that she had a back problem and endeavored to cancel the settlement agreement. In the *Frito-Lay* case, the Court stated:

In the light of subsequent events it may well be that the consideration paid for the release was inadequate to compensate the plaintiffs for the personal injuries sustained by Lena Hutcheson. *The release, however, must be judged by the circumstances and conditions existing at the time of the execution. The adequacy or inadequacy of the consideration may not be viewed in the light of after events.* (Emphasis added)

315 F.2d at 822.

■ All of the information regarding the Rice Drier operations and the circumstances surrounding John Burney's departure had been discovered and were known by Southern Farm prior to the time that they decided to settle this case with Bonnie Burney.

In *New York Life Insurance Co. v. Chittenden and Eastmen*, 134 Iowa 613, 112 N.W. 96 (1907), the insured absented himself from the state and concealed his whereabouts from his family for a period of seven years. A claim was filed against the insurance company. To avoid a trial and the possibility of the beneficiaries obtaining a judgment, New York Life settled the case. After the settlement the insured reappeared. New York Life sought to recover the money. The Supreme Court of Iowa stated:

... this compromise and settlement of a claim based on the assertion of his (the insured) death was, we think, binding and conclusive on the company ... *Therefore, we think that a settlement by which the money was paid for the purpose of avoiding a suit in which such a judgment might have been rendered is also conclusive, and that the plaintiff cannot now recover back the money thus paid.* (Emphasis added)

112 N.W. at 98.

*See also, Sears v. Grand Lodge AOUW of New York*, 163 N.Y. 374, 57 N.E. 618 (1900).

The Court finds the settlement agreement in this case to be valid and binding.

The settlement agreement in this case was a compromise of a "disputed and controverted claim." Both sides were represented by counsel, they had basically the same facts, they considered their own best interests and entered into a binding contract.

Accordingly, plaintiff's claim against Bonnie Burney is dismissed.

Defendants Loyall Barr, Gerry Barr and Dr. C.P. McCarty, Sr., were Directors of Helena Rice Drier, Inc., along with John Burney and George Brandon, now deceased, at the time of John Burney's disappearance.

These defendants had no knowledge of the whereabouts of John Burney following his disappearance on June 11, 1976, and had no contact with him until he returned to Arkansas in December 1982. The director defendants are not guilty of conspiracy or fraud with reference to the disappearance of John Burney.

Extensive attempts were made to locate John Burney by offering rewards through newspaper advertisements, the employment of private investigators and other means and methods to determine his whereabouts. All to no avail.

Prior to the disappearance, a number of farmers had brought suit against Helena Rice Drier, Inc., and the Directors, individually, seeking recovery for soybeans and wheat stored in the Rice Drier facilities, which suits were pending in the Chancery Court of Phillips County, Arkansas, at the time of Burney's disappearance.

Helena Rice Drier, Inc., was the owner and beneficiary of three policies on the life of Burney, the face amount being, respectively, $300,000.00, $50,000.00, and $30,000.00. The latter two policies had double indemnity provisions in the event of accidental death. The Corporation borrowed money on the cash values of the policies to maintain the premiums after the disappearance of Burney, and in addition, the Directors personally paid the remaining premiums due by advancing funds to the Corporation through a period of more than five years from June 11, 1976. Loans were outstanding on the policies at the time of the settlement made in the United States District Court cases.

A portion of the chancery court suits were settled by the payment of $300,000 by the insurance carriers of C.P. McCarty, Jr., $150,000 by the insurance carriers of C.P. McCarty, Sr., the assignment of proceeds from the litigation against Merrill Lynch, Pierce, Fenner and Smith, Inc., and the transfer to the farmers of the insurance policies on the life of Burney held by Helena Rice Drier, Inc., and the agreement that any funds received therefrom would be paid to the plaintiff farmers. This was a settlement of contested litigation, and a portion of the litigation is still pending, since one farmer has refused to accept the settlement.

Helena Rice Drier, Inc., filed suits against plaintiff to recover on the three policies issued on the life of John Burney after his disappearance. These suits were settled prior to trial with payment under the Rice Drier policies of $380,000 being made, which pursuant to the settlement in the Phillips County Chancery Court was paid into the registry of the court and distributed to the numerous former plaintiffs.

The plaintiff paid a total of $380,000 under the three policies, did not deduct the amount of the loan outstanding on each of the policies, did not pay double indemnity on any policy, and did not pay prejudgment interest, penalty or attorney's fees, for which they had possible liability under the applicable Arkansas law.

These defendants executed a release prepared by plaintiff, or their attorneys, identical to the release signed by Bonnie Burney, indicating this was a compromise in settlement of a disputed claim.

As heretofore indicated, it is basic that the policy of the law is to encourage settlement of litigation and to uphold and enforce contracts of settlement if they are fairly arrived at, not in contravention of law or public policy. *McCoy Farms, Inc., v. McKee*, 263 Ark. 20, 563 S.W.2d 409 (1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 184, 58 L.Ed.2d 171 (1978); *Brewer v. Brewer*, 239 Ark. 614, 390 S.W.2d 630 (1965); *Squires v. Beaumont*, 233 Ark. 489, 345 S.W.2d 465 (1961); *Burke v. Downing Co.*, 198 Ark. 405, 129 S.W.2d 946 (1939). Plaintiff's attempt to set aside its compromise and payment is contrary to this principle. The settlement is binding on plaintiff as no fraud was practiced on it by these defendants. Two of the policies had double indemnity features and plaintiff knew that there was evidence that a body was seen floating in the Mississippi River at the approximate time of Burney's disap-

pearance which might well be accepted as proof that it was his body.

The Court has given careful consideration to the excellent brief filed by plaintiff and the citations contained therein but finds the cited cases are not controlling since they are distinguishable from the case at bar. Accordingly, no grounds exist for setting the compromise settlement aside.

Judgment will be entered in accordance with this Memorandum Opinion.